# UNITED STATES COURT OF APPEALS

# FOR THE TENTH CIRCUIT

JAMES HUNTER

      Plaintiff—Appellant,

Case No. 24-1210
(D.C. No. 23-CV-2989-DDD-MEH)

ALEXIS KING, et al.

      Defendant—Appellee.

---

## OPENING BRIEF

---

Appeal from the United States District Court for the District of Colorado
Honorable Daniel D. Domenico
Civil Action No. 23-CV-2989-DDD-MEH

**ORAL ARGUMENT IS REQUESTED**

Kenneth Mark Burton
Law Office of Mark Burton, P.C.
1175 Osage St., Suite 210
Denver, Colorado 80204

## STATEMENT REGARDING ORAL ARGUMENT

Plaintiff Mr. Hunter respectfully moves the Tenth Circuit for leave to present oral argument pursuant to Fed.R.App. 34(a); 10th Cir.R. 34.1.9.1 and asserts that oral argument would materially assist in the determination of this appeal. As such, this case should, therefore, be submitted for oral argument.

## STATEMENT OF PRIOR OR RELATED APPEALS

No prior or related appeals exist.

## CERTIFICATE OF COMPLIANCE

1.     The Appellant's Brief is in compliance with the type-volume limitations of Fed.R.App.P. 32(a)(7)(B) because this brief does not exceed 13,000 words and contains 6,569 words.

2.     This brief complies with the typeface requirements of Fed.R.App.P. 32(a)(5) and the type style requirements of Fed.R.App.P. 32(a)(6), because this brief has been prepared in a proportionally space typeface used by Microsoft Office Word.

s/ Kenneth Mark Burton

# TABLE OF CONTENTS

Page

STATEMENT REGARDING ORAL ARGUMENT . . . …………………… ii

STATEMENT OF PRIOR OR RELATED APPEALS …………………. iii

CERTIFICATE OF COMPLIANCE………………………………………… iii

TABLE OF AUTHORITIES ……………………………………..……… vii

JURISDICTIONAL STATEMENT………………………………..…….. 1

QUESTIONS PRESENTED ……………………………………………….. 1

STATEMENT OF CASE………………………………..……………….. 2

    Nature of Case
    ……………………………………………………… 2

Course of Proceedings and Disposition of District Court. ………….. 3

    A. Complaint………………………………………….……………… 3

    B. Summary Dismissal of Injunctive and Declaratory Relief 5

Facts Relevant to Issues on Appeal ………………………………. 6

SUMMARY OF ARGUMENT…………………….………………...…… 13

ARGUMENT……………………………………………….………... 14

I. The Trial Court Erred as a Matter of Law in Dismissing Plaintiffs Complaint Because the Pleadings Sufficiently Alleged Facts from Which a Jury May Reasonably Infer That The Defendants Violated Mr. Hunter's Constitutional Rights Under The Eighth And Fourteenth Amendment. ………………………………………...………………. 13

A. Summary Dismissal Jurisprudence..……………………………. 15

B. Mr. Hunter States A Serious and Meritorious Due Process Claim . 16

    l. Rooker-Feldman's Doctrine is obviously misplaced. 18

        a. State Court of Appeals Judgment has no preclusive effect because it was invalidated by Colorado's Amendment to the DNA statute 23

        b. Colorado's statutory clemency laws establish a liberty interest in establishing actual innocence. 25

        c. Recent Brady violations are unresolved. 26

        d. Actual innocence exception under 28 U.S.C. 2254 is unaffected by a State Court judgment. 29

        e. Bad faith prosecution exception is actionable under 1983. 35

CONCLUSION …………………………………………………….... 38

CERTIFICATE OF DIGITAL SUBMISSION                    38

CERTIFICATE OF EXACT COPIES                          38

ATTACHMENTS

ECF No. 39 Plaintiffs Amended Complaint

ECF No. 75 order, April 19, 2024

# TABLE OF AUTHORITIES

CASES:                                                                          PAGE(S)

Barnett Bank of Marion County v. Nelson, 517 U.S. 25, 134 L. Ed. 2d
237, 116 S. Ct. 1103 (1996)…………………………………………    31

Blake v. Papadakos, 953 F.2d 68, 71 n.2 (3d Cir. 1992)……………    29

Board of County Commissioners v. Bowen/Edwards Associates, Inc.,
830 P.2d 1045 (Colo. 1992)…………………………………………    32

Board of Regents of State Colleges v. Roth, 408 U.S. 564, 92 S. Ct.
2701, 33 L. Ed. 2d 548 (1972)………………………………………    17

Brady v. Maryland, 373 U.S. 83 (1963)……………………………    10,13,26

Brokers' Choice of Am., Inc. v. NBC Universal, Inc., 861 F.3d 1081
(10th Cir. 2017)………………………………………………………    15

Brubaker v. Board of County Commissioners, 652 P.2d 1050(Colo.
1982)…………………………………………………………………    32

Connecticut Bd. Of Pardons v. Dumschat, 452 U.S. 458, 101 S. Ct.
2460, 69 L. Ed. 2d 158 1981………………………………………..    25

D.C. Court of Appeals v. Feldman, 460 U.S. 462 (1983)……………    19

District Attorney's Office for Third Judicial Dist. V. Osborne, 557 U.
S. 52, 129 S. Ct. 2308, 174 L. Ed. 2d38 2009 ………………………    30

Drexler v. Spahn, No. 21-1368, 2022 U.S. App. LEXIS 33002, 2022
WL 17333076 (10th Cit Nov. 30, 2022)…………………………….    23

Engle v. Isaac, 456 U.S. 107 (1982)…………………………………    33

Erlandson v. Northglenn Mun. Ct., 528 F.3d 785 (10th Cir. 2008)…..    15

Ex parte Virginia, 100 U.S. 339 (1880)……………………………    36

Golden State Transit Corp v. City of Los Angeles, 493 U.S. 103, 110
S.Ct. 444, 449, 107 L.Ed.2d 420, 428 1989 …………………………..    32

Herrera v. City of Espanola, 32 F.4th 980 (10th Cir. 2022)………….    15

House v. Bell, 547 U.S. 518 (2006)…………………………………    33

Hunter v. King, 2024 U.S. Dist. LEXIS 93881……………………    1,5

Jones v. Flowers, 547 U.S. 220, 226-239, 126 S. Ct. 1708, 164 L. Ed.
2d 415 (2006)…………………………………………………………    16

Kalb v. Feuerstein, 308 U.S. 433(1940)……………………………    35

Kline v. Burke Constmction co., 260 U.S. 226(1922)………………    35

McQuiggin v. Perkins, 569 U.S. 383 (2013)…………………………    passim

McNeese v. Board of Education, 373 U.S. 668 (1963)……………    35

Medina v. California, 505 U.S. 437 (1992)…………………………..    27

Monroe v. Pape, 365 U.S. 167(1961)………………………………..    33

Murray v. Carrier, 477 U.S. 478 (1986)……………………………    35

Olim v. Wakinekona, 461 U.S. 238, 103 S. Ct. 1741, 75 L. Ed. 2d 813
1983……………………………………………………………….    17

People v. Deitchman, 695 P.2d 1146 (Colo. 1985)………………    32

People v. Hunter, 2019 Colo. App. LEXIS 637 (Colo. Ct. App., Apr
25, 2019)……………………………………………………………    23

Pennsylvania v. Finley, 481 U.S. 551, 556 (1987)…………………. 27

Plyier v. Moore, 129 F.3d 728, 732 (4th Cir. 1997)………………… 29

Providence & N. Y S. S. co. v. Hill Mfg. Co., 109 U.S 578(1883)…. 35

Ritter v. Ross, 992 F.2d 750, 753 (7th Cir. 1993)…………………. 29

Rooker v. Fid. Trust co., 263 U.S. 413 (1923)…………………….. 18

Santa Fe All. for Pub. Health & Safety v. City of Santa Fe, 993 F.3d 802 (10th Cir. 2021)………………………………………………….. 15

Schlup v. Delo, 513 U.S. 298 (1995)………………………………. passim

Shelley v. Kraemer, 334 U.S. 1 (1948)……………………………. 35

Skinner v. Switzer, 562 U. S. 521, 131 S. Ct. 1289, 179 L. Ed. 2d 233 (2011)………………………………………………………….. 20

Solar v. City of Farmington, 2 F.4th 1285 (10th Cir. 2021)……….. 15

Thayer v. McDonald, 781 P.2d 190 (1989)…………………………. 31

Treinies v. Sunshine Mining Co., 308 U.S. 66(1939)……………….. 35

United States v. City & County of Denver, 100 F.3d 1509 (10th Cir. 1996)…………………………………………………………… 32

Worldwide Church of God v. McNair, 805 F.2d 888 (9th Cir. 1986).. 18

Zinermon v. Burch, 494 U. S. 113, 110 S. Ct. 975, 108 L. Ed. 2d 100 (1990)………………………………………………………… 17

Zwickler v. Koota, 389 U.S. 241 (1967)……………………………… 36

**CONSTITUTIONAL PROVISIONS**

U.S. Const. AmendVIII …………………………………………….    Passim

U.S. Const. Amend XIV …………………………………………    Passim

**STATUTES**

28 U.S.C. § 1291 …………………………………………………    1

28 U.S.C. § 1331 ………………………………………………...    1

28 U.S.C. § 2254 ………………………………………………...    passim

42 U.S.C. § 1983 ………………………………………………    passim

C.R.S. § 16 -17-101 …………………………………………    passim

C.R.S. § 16-17-102 …………………………………………….    passim

## STATEMENT OF JURISDICTION

The Court has subject matter jurisdiction over the action pursuant to the 42 U.S.C. 1983 and 28 U.S.C. 1331, and 1342. Jurisdiction to review the district court's entry of judgment is conferred by 28 U.S.C. 1291. The District Court entered an Order of Dismissal on April 19, 2024. Hunter v. King, 2024 U.S. Dist. LEXIS 93881 *15-16. Mr. Hunter filed a timely Notice of Appeal before May 18, 2023. Accordingly, the Court has jurisdiction over this appeal.

## STATEMENT OF ISSUES

I.    Whether Mr. Hunter's Complaint alleged sufficient facts to state a constitutional violation under the Fourteenth Amendment.

II.   Did the Trial Court err in dismissing Plaintiff's Complaint under the Rooker-Feldman Doctrine?

IV.   Does the Rooker-Feldman Doctrine apply, here, where an individual's request for DNA evidence is born of a recent discovery of malfeasance of the Colorado Bureau of Investigations that was never fully and finally litigated?

V.    Does the Rooker-Feldman doctrine apply in the face of a State Court judgment that was rendered a nullity due to recent changes in statutory Law?

VI.  Is the Application of the Rooker-Feldman doctrine based on a State Court denial of DNA testing improper where actual innocent is asserted, and DNA testing is requested to establish a gateway claim for purposes of Habeas Corpus?

VII. Is Federal Law –Schlup and McQuiggin, in conflict with Colorado law?

VIII.  What is the proper mechanism to prove actual innocence through DNA testing 42 U.S.C. 1983 or 28 U.S.C. 2254?

## STATEMENT OF THE CASE

### I.      Nature of the Case

Plaintiff Mr. James Hunter filed a 1983 action against various governmental agencies, naming four key individuals that have control and/or custody of exculpatory DNA and forensic evidence needed to prove Mr. Hunter's actual innocence. Interestingly, these Defendants each refuse to produce this exculpatory evidence, which has had the direct effect of violating Mr. Hunter's Fourteenth Amendment right to collaterally attack his conviction based on the actual innocence exception. Unfortunately, the law is unclear as to the proper mechanism for proving actual innocence (28 U.S.C. 2254 and 28 U.S.C. 1983) when seeking to effectively and fairly attack a state court judgment.

The Trial Court summarily dismissed Mr. Hunter's Complaint based on an erroneous finding of facts and misapplication of controlling legal authority—Rooker-Feldman doctrine, which failed to properly recognize that the issue of actual innocence was based on the recent discovery of Mr. Hunter's false identification by a corrupt Colorado Bureau of Investigation forensic scientists, that begs for the retesting of biological evidence and disclosure of internal audit reports that are highly exculpatory.

Plaintiff Mr. Hunter appeals the Trial Court's erroneous finding of facts and misapplication of law and moves the Tenth Circuit Court of Appeals to rescind the extant judgment and remand for further proceedings on the merits.

## COURSE OF PROCEEDINGS AND DISPOSITION IN DISTRICT COURT

### A.    Complaint & Motion for Preliminary Injunction

On November 13, 2023, the Plaintiff Mr. James Hunter filed a Complaint (ECF # l) under 42 U.S.C. 1983, alleging that his due process rights under the 14th Amendment were violated when the Defendants Alexis King, Chris Schaffer, Chief of Police Smith, and Yvonne M. Woods intentionally concealed exculpatory evidence and denied him access to DNA evidence required to effectively establish an exception to the procedural bars (successive petition and time bar)—actual

innocence. (ECF #1, pp. 1-20) Mr. Hunter has never alleged that his due process rights under the 14th Amendment were violated with respect to a Colorado Court of Appeals decision denying a postconviction petition for DNA testing. Pointedly, this action was not an appeal of the State Court judgment.

Plaintiff sought both declaratory and injunctive relief finding that the acts of Defendants violated his due process rights and injunctive relief requiring Defendants to provide him access to certain evidence for DNA testing, including Colorado Bureau of Investigation reports that were exculpatory. (Id. at ¶ 64.)

On January 19, 2024, Defendants Alexis King and Reggie Marinelli filed a motion to dismiss Plaintiffs complaint. (Doc. No. 27.)

On January 23, 2024, Defendants Alex Jameson filed a motion to dismiss. (Doc. No. 28).

In the amended complaint, additional allegations regarding the constitutionality of Colorado's post-conviction DNA statute were added to enhance the factual pleading and focus the issue on the recent discovery of a false identification by Colorado Bureau of Investigation's forensic scientist Woods. (Doc. No. 39.). The Defendants each subsequently moved to dismiss the amended complaint. (Doc. Nos. 41, 43, 47, 72.)

**B.**     **Summary Dismissal of Injunctive and Declaratory Relief.**

On April 19th, 2024, the Trial Court entered a 12 page order of dismissal, which provides an analysis of the legal standards applied, but unfortunately applied a distorted and incomplete factual narrative, that predictably yielded a distorted and inaccurate finding of facts; specifically, the Trial Court acknowledge a Colorado appellate action as a valid holding that involved a DNA request, but ignored that changes in the law and factual circumstance presented new issues that were never finally and fully litigated, and ignored that changes in the law rendered this holding invalid. Consequently, the Trial Court misapplied the Rooker-Feldman doctrine to an invalid holding and factual issues that were never resolved, and effectively denied Mr. Hunter a gateway claim based on actual innocence. Hunter v. King, 2024 U.S. Dist. LEXIS 93881 *4-16 In addition, the District Court's analysis of the Rooker-Feldman doctrine was single minded and ignored that Congress has authorized the attack of state court criminal judgments through federal habeas review of state prisoners' petitions. 28 U.S.C. 2254(a), which as a threshold matter requires a showing of actual innocence in this case through retesting of DNA evidence and disclosure of exculpatory evidence. See Exxon Mobil Corp. v. Saudi Basic Indus. corp., 544 U.S. 280, 292 n. 8 (2005).

Plaintiff Mr. Hunter, now, appeals the Trial Court's dismissal of his complaint, and respectfully moves the Tenth Circuit Court of Appeals to rescind the extant order and judgment.

## FACTS RELEVANT TO ISSUES ON APPEAL

This is an appeal of an innocent citizen's denial of DNA testing and exculpatory evidence required to establish a basis for Federal Habeas Corpus and/or State clemency and postconviction review. The Defendants and other state officials recognize that the identification evidence used to convict Mr. Hunter was fraudulent or invalid, but they actively seek to conceal this evidence and are preventing DNA testing in an effort to cover-up a massive fraud scheme perpetuated by the Colorado Bureau of Investigations. This miscarriage of justice is outrageous and has no place in our system of justice, presenting the quintessential circumstance in which the Tenth Circuit should rescind the denial of an obvious due process claim in the interest of justice and order DNA testing. Otherwise, how else can an innocent person prove his innocence for purposes of clemency and/or Federal Habeas review? Why withhold the truth and withhold the only true means of proving innocence that is required for further Federal Habeas and State postconviction relief? The answer is obvious, but difficult to say—corruption in its purest form.

### A. Mr. Hunter is Factually and Actually Innocent

The Prosecution arrested and charged Mr. Hunter with second-degree burglary and sexual assault. Mr. Hunter was convicted of second-degree burglary, and sexual assault. The Prosecution's theory of case was that Mr. Hunter unlawfully entered the premises of R.H., his neighbor, while wearing a mask, and sexually assaulted her and her daughter.

It is alleged that on April 23, 2002, the victim R.H. was at her residence m Lakewood, Colorado, when around 1 a.m. in the morning, she saw a figure in her hall of her home with what appeared to be a sock over his face. The burglar attacked R.H. and sexually assaulted her repeated. This struggle between the victim and perpetrator and the sexual assault left a substantial amount of biological evidence throughout the residence, including in a rape kit that was collected.

Unfortunately, the forensic science was undeveloped in 2002 and left virtually all this evidence untested. Importantly, the rape kit was never tested. Particularly relevant is that with today's science, a very small quantity of sperm cells that were missed during the initial review can be identified, including epithelial cells (skin cells) that previously could not be detected using "autosomal STR" or "Y-STR testing". This evidence if tested would definitively prove Mr. Hunter's innocence.

Eventually, Mr. Hunter was arrested and charged with the underlying crime. However, this criminal action was dismissed at a preliminary hearing due to the absence of evidence linking Mr. Hunter to the crime scene. In fact, Judge Olson was so outraged that the Defendant Yvonne Woods had submitted a false affidavit for the arrest of Mr. Hunter, that he dismissed the case:

> The Court will find at this point in the investigation having knocked out what is the one piece that the Court issued the Affidavit based on, and set bond on, is not probable cause and I think we need to go back to the timing here. I signed this on June 26th is when microscopically there's an unequivocal statement that pubic hair found in her vagina were his and not hers. Ah, now we find out it's, I mean the person that made the findings [Yvonne Woods] is embarrassed, um, but the fact of the matter is, ah, it's just the opposite. They're not his, and probably hers. Ah, and that's a huge difference to the Court. There is an issue as to whether this warrant would have been signed without that piece of information in it but there's not a big issue as to whether there is probable cause at this point the Court's perspective there just, it's one thing to say the Court will view he evidence in a light most favorable to the People, but in each case we're talking about inferences and evidence doesn't tie, ah, Mr. Hunter to the case at least at this point in the investigation on, ah, any basis other than he, he is the person who lives next door. And, so the Court will find at this point that in deed more investigation does need to be done. . . But the fact of the matter is, um, he's been held on a quarter million dollar bond when the premise of the warrant and the premise of the bond just turned out to be false. So the defendant will be ordered release.

8

Preliminary Hearing, October 17, 2002, Transcripts, pp. 90-92, Case No. 02CR3254 (Jefferson County). This false arrest and evidence of a malicious prosecution was the motivating factor behind Wood's subsequent efforts to rearrest Mr. Hunter and conviction him based on false evidence.

Ten months after the alleged crime, new evidence was manufactured to establish identification of Mr. Hunter as the rapist, after the crime scene had been thoroughly reviewed and no evidence was found linking Mr. Hunter to the subject burglary and sexual assault.

Evidence of a hair pack was found and logged with the Lakewood Police Department. Interestingly though, Technicians from CBI and Lakewood Police Department could not confirm the evidentiary source of the hairs, suggesting that this evidence had been manufactured and derivative of the original hair pack produced voluntarily by Mr. Hunter during his initial arrest. Still, the Prosecution used Woods manufactured evidence to convict Mr. Hunter, an innocent citizen.

On December 12, 2002, a grand jury was convened, approximately 7 days after this false hair evidence was manufactured by Woods and entered into the Lakewood Police Departments evidence locker. Mr. Hunter was indicted based on

the false testimony provided by CBI Forensic Scientist Woods that she had tested

this new evidence, and that it linked Mr. Hunter to the burglary and rape of R.H.

Mr. Hunter's defense has been consistent from the outset, that he had

absolutely nothing to do with this crime. The interested parties and law enforcement

know to a degree of certainty that Mr. Hunter is innocence and that he was framed

by Woods, but he remains in prison deprived of any effort to prove his innocence,

while the evidence in this matter remains untested, including the rape kit.

### B. Mr. Hunter's Demand for DNA and Exculpatory Evidence

The factual pleadings present a meritorious basis for DNA testing and request

for Brady evidence (exculpatory evidence related to Mr. Hunter's fraudulent

identification), which is required to effectively prove Mr. Hunter's actual innocence

at the State and Federal level, including establish a presumptive basis for clemency.

The Defendants, including the Colorado Bureau of Investigations have intentionally

concealed evidence of Woods' corrupt forensic testing practices and history of

framing individuals, which is sufficient evidence to invalidate the States

identification evidence and effectively undermines  DNA evidence presented at

trial, and moreover triggers a need for testing of the rape kit (evidence that was

never tested and that will definitively prove that Mr. Hunter is not the perpetrator of this horrendous crime). [ECF # 39, ¶

Importantly, a gateway claim is not foreclosed by a State Court ruling denying DNA testing pursuant to Colorado's repealed statutory DNA statute, premised on the notion that a Defendant's right to assert an actual innocence claim—gateway claim, is a federal right that may invoked at the time his innocence becomes apparent or at the time he seeks to overcome a procedural bar; otherwise, Colorado's holding or statutory law is in conflict with Schlup v. Delo, 513 U.S. 298, 328-29 (1995) and McQuiggin v. Perkins, 569 U.S. 383, 387 (2013)'s gateway claim—actual innocence; thus, rendering Colorado's statutory law or Colorado DNA holdings that bar DNA testing in federal proceedings void for want of jurisdiction under the Supremacy clause.

### 1.  Retesting of DNA evidence is needed to establish Mr. Hunter's actual innocence—an exception to procedural bar.

The retesting of DNA evidence is required to establish Mr. Hunter's gateway claim under the miscarriage of justice exception, as set forth in Schlup and McQuiggin.

Methodologies have improved since 2001; in fact, since 2006, there is now the ability to look for DNA at markers that could not have been searched in 2006.

In 2006, DNA testing was generally for 15 markers for autosomal STR or 17 markers for Y-STR. Now kits test for 21 markers for STR testing, or 23 of Y-STR testing. In fact, touch DNA testing was not available in 2002 and, although available in 2006, most of the forensic laboratories were not conducting touch DNA testing at the relevant time. As such, the sexual assault kit can be tested for seminal fluid in case there is a very small quantity of sperm cells that might have been missed in the earlier testing. And even if no seminal fluid or sperm cells were present, there could be male DNA in the form of epithelial cells, or skin cells, which could now be detected using "autosomal STR" or "Y-STR testing." In addition, it is now possible to test the victim's pubic hair combings for presence of male DNA in the form of epithelial cells, which was not possible at the outset when this crime occurred.

**2.  DNA Testing was required to establish a basis for Clemency**

To establish the injustice requirement under Colorado's clemency process, Mr. Hunter will require DNA testing to show that he was not the individual that raped or harmed the innocent victim R.H.

**3.  CBI's internal reports are Brady evidence that would establish the invalidity of Mr. Hunter's identification.**

CBI's internal investigation of the Yvonne Woods scandal has identified widespread fraud that the Defendants are actively working to conceal. This evidence invalidates the identification evidence used to frame Mr. Hunter and is required to establish Plaintiffs gateway claim.

## SUMMARY OF ARGUMENT

The present matter presents a case of improper dismissal of a tenable Due Process claim based on an erroneous finding of facts and improper use of Rooker-Feldman doctrine to impede an actual innocence gateway claim—DNA testing and disclosure of exculpatory evidence required to prove actual innocence, based on an invalid Colorado State holding that was premised on a repealed statute.

The denial of DNA or Brady v. Maryland, 373 U.S. 83 (1963) evidence at the State level; and this extant judgment or holding does not foreclose the use of a gateway claim or miscarriage of justice exception, let alone the procurement of evidence to establish actual innocence through section 1983. Any State law or holding that attempts to impede this actual innocence gateway claim, that is based on Federal law, is void under the Supremacy Clause of the United States; therefore, rendering the Rooker-Feldman doctrine inapplicable.

# ARGUMENT

**III**. **The Trial Court Erred As A Matter Of Law In Dismissing Plaintiffs Complaint Because The Factual Pleadings Sufficiently Alleged Facts From Which A Jury May Reasonable Infer That The Defendants Violated Mr. Hunter's Constitutional Rights Under The Eighth And Fourteenth Amendment.**

The Court of Appeals should find that a meritorious Fourteenth Amendment claim was pled, establishing a tenable due process claim based on a justiciable controversy—denial of a gateway claim (actual innocence) and denial of exculpatory evidence, and reverse the judgment of the District Court and remand for further proceedings on the merits.

**Preservation of Issues**: The assignment of errors was preserved at the trial court level. In the District Court's Order of dismissal, the Trial Court dismissed Plaintiff Mr. Hunter's Complaint at the pleading stage in response to Defendant's Motion to Dismiss. Hunter v. King, 2024 U.S. Dist. LEXIS 93881, * 1-16. Therefore, Plaintiffs assignment of error and issues articulated herein are ripe for review.

**Standards of Review**: A Rule 12(b)(6) dismissal is reviewed de novo, through the Rule 12(b)(6) analysis applied at the trial court level. See Sagome, Inc. v. Cincinnati Ins. co., 56 F.4th 931, 934 (10th Cir. 2023).

Like Rule 12(b)(6) dismissals, "[This Court] also review[s] questions of statutory interpretation de novo." Solar v. City of Farmington, 2 F.4th 1285, 1289 (10th Cir. 2021).

The district court ruled that Mr. Hunter 's claims were jurisdictionally barred by the Rooker-Feldman doctrine. On this issue, the Court of Appeals conducts a de novo review. Erlandson v. Northglenn Mun. Ct., 528 F.3d 785, 788-89 (10th Cir. 2008).

### A. Summary Dismissal Jurisprudence

"[A]ll well-pleaded factual allegations in the complaint are accepted as true and viewed in the light most favorable to the nonmoving party." Herrera v. City of Espanola, 32 F.4th 980, 991 (10th Cir. 2022) (quotation marks omitted). "A complaint must contain 'enough facts to state a claim to relief that is plausible on its face.'" Santa Fe All. for Pub. Health & Safety v. City of Santa Fe, 993 F.3d 802, 811 (10th Cir. 2021) (quoting Bell Atl. com v. Twombly, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)). "[D]ismissal under Rule is appropriate if the complaint alone is legally insufficient to state a claim." Brokers' Choice of Am., Inc. v. NBC Universal, Inc., 861 F.3d 1081, 1104-05 (10th Cir. 2017). Here, the district

court granted dismissal of Mr. Hunter's claim for want of jurisdiction based on the Rooker-Feldman doctrine.

"The nature and specificity of the allegations required to state a plausible claim will vary based on context." Kan. Penn Gaming, LLC v. Collins, 656 F.3d 1210, 1215 (10th Cir. 2011).

**B. Mr. Hunter States A Serious and Meritorious Due Process Claim.**

When State government and its officers actively work to keep a person wrongfully imprisoned by obstructing his effort to establish his actual innocence through Federal Habeas Corpus, a Plaintiff is entitled to 1983 relief to enjoin this corrupt and unfair denial of the collateral attack of an unconstitutional judgment. A de novo review of the factual pleadings reveals a plausible entitlement to relief under the Fourteenth Amendment. For this reason, the Trial Court erred in dismissing Mr. Hunter's Complaint.

"No State shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. Const., Amend. 14, 1; accord, Amend. 5. This Clause imposes procedural limitations on a state's power to take away protected entitlements. See, e.g., Jones v. Flowers, 547 U.S. 220, 226-239, 126 S. Ct. 1708, 164 L. Ed. 2d 415 (2006). Osborne argues that access to the State's evidence is a

"process" needed to vindicate his right to prove himself innocent and get out of jail.

Process is not an end in itself, so a necessary premise of this argument is that he has

an entitlement—a "liberty interest" to prove his innocence even after a fair trial has

proved otherwise. The process entitled for the asserted liberty interest to be

determined is in question. see Board of Regents of State Colleges v. Roth, 408 U.S.

564, 570-571, 92 S. Ct. 2701, 33 L. Ed. 2d 548 (1972); Olim v. Wakinekona, 461

U.S. 238, 250-251, 103 S.Ct. 1741, 75 L. Ed. 2d 813 (1983).

To establish a procedural due process violation, a Plaintiff must establish that:

(i) deprivation by state action of a protected interest in life, liberty, or property, and

(ii) inadequate state process. See Zinennon v. Burch, 494 U. S. 113, 125, 110 S. Ct.

975, 108 L. Ed. 2d 100 (1990).

In Mr. Hunter's case, the Defendant's refusal to provide him with a

fundamentally fair collateral attack process was complete when the state litigation

ended and deprived him of his asserted liberty interest in DNA testing and actively

worked to conceal exculpatory evidence, which has naturally prevented him from

making a showing of actual innocence for purposes of establishing an exception to

Federal Habeas and State procedural bars—a gateway claim based on miscarriage

of justice.

### 1. Rooker-Feldman's Doctrine is obviously misplaced.

The Trial Court erred in applying the Rooker-Feldman doctrine to an actual innocence case that is clearly subject to attack at the Federal level via 28 U.S.C § 2254, including a gate claim based on DNA that is actionable under section 1983.

Because Rooker-Feldman arises from federal jurisdictional statutes, the threshold question is whether the doctrine allows federal courts to entertain these adversary proceedings at all. At its core, the Rooker-Feldman doctrine stands for the unremarkable proposition that federal district courts are courts of original, not appellate, jurisdiction. See 28 U.S.C. 1331, 1332. Thus, it follows that federal district courts have "no authority to review the final determinations of a state court in judicial proceedings." Worldwide Church of God v. McNair, 805 F.2d 888, 890 (9th Cir. 1986). Direct federal appellate review of state court decisions must occur, if at all, in the Supreme Court. See 28 U.S.C. 1257.

Rooker-Feldman is not a constitutional doctrine. Rather, the doctrine arises out of a pair of negative inferences drawn from two statutes: 28 U.S.C. 1331 , which establishes the district court's "original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States"; and 28 U.S.C. 1257, which allows Supreme Court review of "final judgments or decrees rendered by the highest court of a State in which a decision could be had. "

v. Fid. Trust Co. itself relied upon "the legislation of Congress," namely the predecessors of these statutes in the Judicial Code. See Rooker, 263 U.S. at 416 (construing Judicial Code, 237, ch. 448, 2, 39 Stat. 726 (1916) (current version at 28 U.S.C. 1257 (1988)), and Judicial code, 24, ch. 231, 24, 36 Stat. 1091 (1911) (current version at 28 U.S.C. 1331 (1980)); see also . at 476 (construing 28 U.S.C. 1257); cf. Asarco Inc. v. Kadish, 490 U.S. 605, 622, 104

L. Ed. 2d 696, 109 S. ct. 2037 (1989) ("The Rooker-Feldman doctrine          28 U.S.C. 1257 as ordinarily barring direct review in the lower federal courts of a decision reached by the highest state court . . . e"). Since Feldman, the Supreme Court has declined opportunities to extend, or even apply, the doctrine.

Of course, the statutes that form the basis of the Rooker-Feldman doctrine coexist among other federal jurisdictional laws. To establish a intelligible theory of federal jurisdiction, one must consider the entire federal jurisdictional constellation. In this case, aside from the statutes of general jurisdiction, two other guiding jurisdictional stars control this analysis: the federal law of habeas corpus and Civil Rights Act, including relevant Supreme Court jurisprudence.

It is generally true that a judgment by a court of competent jurisdiction bears a presumption of regularity and is not thereafter subject to collateral attack. But Congress, because its power over the subject of civil rights is plenary, may by

specific habeas corpus and civil rights legislation create an exception to that principle and render judicial acts taken with respect to the person whom Federal law protects nullities and vulnerable collaterally.

That doctrine prohibits federal courts from adjudicating cases brought by state-court losing parties challenging state-court judgments. But as this Court explained in Skinner v. Switzer, even though a "state-court decision is not reviewable by lower federal courts," a "statute or rule governing the decision may be challenged in a federal action." 562 U. S. 521, 532, 131 S. Ct. 1289, 179 L. Ed. 2d 233 (2011).

Here, as in Skinner, Mr. Hunter does "not challenge the adverse" state-court decisions themselves, but rather "targets as unconstitutional the Colorado statute they authoritatively construed." Ibid. In addition, Mr. Hunter sought to enjoin the Defendants intentional concealment of exculpatory evidence and compel disclosure of evidence of the invalidity of identification evidence—a new issue recently discovered, which has effectively prevented Mr. Hunter from establishing his actual innocence for purposes of Federal Habeas Corpus review under 28 U.S.C. § 2254, and exhausting State remedies related to the recent discovery of CBI's fraudulent identification.

Mr. Hunter alleges that the evidence used to convict him is suspect because the Colorado Bureau of Investigation recently found that one of the forensic scientists working on his case had manipulated data in the DNA testing process, calling into question the integrity of his identification. (ECF No. 39 at ¶¶ 20, 61) Plaintiff also emphasized that DNA testing has advanced significantly since the time of his conviction, and that it is now far more reliable than it used to be, casting doubt on the DNA results that were used to convict him some twenty-plus years ago. (ECF No. 39 at ¶¶ 25, 31) Notably the rape kit and key evidence was never tested due to the poor science at the time of the initial prosecution. A proper test could, now, identify epithelial cells in the vaginal cavity of the actual perpetrator, and sperm cells that previously could not be identified.

The factual pleadings "were replete with allegations regarding the sufficiency of the evidence that was used to convict [Mr. Hunter] at trial", making a proper showing of actual innocence; and more identified new issues based on the recent CBI scandal supporting innocence that are now justiciable, particularly that he "was prosecuted and tried based on fabricated and false evidence." (ECF No. 39 at ¶¶ 2, 18, 19, 34, 49, 63.)

The Trial Court took "no stance here on the merit of Plaintiffs claims about the reliability of the evidence that was used to support his underlying conviction," The Court simply held in error that the gist of the complaint is to suggest that the Colorado Court of Appeals made an incorrect determination when it found that a favorable DNA test result would not have been enough to make a showing of actual innocence, which ignores that actual innocence is no longer a statutory requirement. Besides, Mr. Hunter successful showing of innocence would naturally debunk the Court of Appeal holding and is required to establish a basis for Habeas Corpus and clemency relief. The impugning of evidence used against Mr. Hunter at trial is required to establish an exception to the procedural bars at the Federal and State level irrespective of Plaintiff's intent and should not be impeded by the misapplication of the Rooker-Feldman doctrine.

These facts, combined with Plaintiffs request for injunctive relief make a proper showing for a new analysis or DNA testing, that is far superior to the fraudulent and invalid testing conducted at the state level by CBI Woods. Invoking actual innocence as a gateway claim does not equate with relitigation of an issue decided in state court; therefore, the Trial Court's bar from assuming jurisdiction

under the Rooker-Feldman doctrine was clearly erroneous and contrary to controlling authority Hunter v. King, 2024 U.S. Dist. LEXIS 93881 *10-11

### a. State Court of Appeal's Judgment has no preclusive effect because it was invalidated by Colorado's Amendment to its DNA statute.

Colorado's DNA statute pre 2023 is clearly unconstitutional, as evidenced by its repeal and recent allocation of a second chance to test DNA evidence in Mr. Hunter's case and lowering of the standard for requesting DNA. The simple notion that the DNA statute was repealed, granting a second chance for testing, supports 1983 relief in this case; especially as here where State officials actively work to stonewall Mr. Hunter's ability to establish good cause for retesting. Drexler v. Spahn, No. 21-1368, 2022 U.S. App. LEXIS 33002, 2022 WL 17333076, at *4 (10th Cir. Nov. 30, 2022) (court had improperly invoked the Rooker-Feldman doctrine with respect to the plaintiffs claim that a state statute was unconstitutional)

The Trial Court's relied on the Colorado Court of Appeal's holding in People v. Hunter, 2019 Colo. App. LEXIS 637 (Colo. Ct. App., Apr. 25, 2019) (Unpublished) in error. In its opinion denying Plaintiffs petition under 18-1-411 to 417, C.R.S. 2021, the Colorado Court of Appeals relied on a repealed version of C.R.S. 18-1-411 to -417, which emphasized that Plaintiff failed to adequately allege, as required by the statute, that favorable results of DNA testing would demonstrate

his actual innocence. This is no longer the standard and clearly bad law, and its application here is a due process violation.

For instance, a Defendant is, now, required to show a reasonable probability that the Petitioner would not have been convicted if favorable results had been obtained through DNA testing at the time of the original prosecution.

A showing of actual innocence is no longer required. C.R.S. 18-1-411 to -413. The specific verbiage "A court shall not order DNA testing unless the petitioner demonstrates by a preponderance of the evidence that... favorable results of the DNA testing will demonstrate the petitioner's actual innocence," has been repealed.

Moreover, a second petition is now permitted upon a proper showing of ineffective assistance of counsel or other factors showing good cause. As such, the complete overhaul of the Colorado DNA statute has effectively rendered the extant judgment of the Colorado Court of Appeal null and void, and now should allow for retesting in Mr. Hunter's case, but most certainly would not foreclose a gate way—actual innocence claim.

However, the conspiratory and pervasive fraudulent concealment of evidence at the state level requires federal intervention to protect this process; hence, the Plaintiffs civil rights action. Irrespective, no valid judgment at the State level exists

to trigger Rooker-Feldman Doctrine. Therefore, the Trial Court's application of this jurisdictional bar was plain error.

> **b.** **Colorado's statutory clemency laws establish a liberty interest in seeking in commutation based on actual innocence.**

The Trial Court erred in rejecting Mr. Hunter's Due Process claim based on the inadequate clemency discovery process, which is required to establish actual innocence or the injustice exception for purpose of clemency or a waiver of criteria for clemency. Hunter v. King, 2024 U.S. Dist. LEXIS 93881, * 15-16

In the State of Colorado, noncapital defendants have a state created liberty interest in review for executive clemency. The power to pardon is vested in the governor through Colorado's constitution. COLO. CONST. art. IV, 7. The power is regulated by COLO. REV. STAT. 16-17-101 to -102 (2010), and thus establishes a state created liberty interest in seeking commutation that is enforceable through the Fourteenth Amendment. Connecticut Bd. of Pardons v. Dumschat, 452 U.S. 458, 464, 101 S. Ct. 2460, 69 L. Ed. 2d 158 (1981). Mr. Hunter, therefore, may challenge the constitutionality of any procedures available to vindicate an interest in state clemency, and the Trial Court's refusal to address the constitutionality of this clemency statute under § 1983 was error.

### c.  Recent Brady violations are unresolved.

The Trial Court erred in refusing to address Mr. Hunter's Brady claim and Due Process claim based on the CBI's Defendant's concealment of exculpatory evidence. Hunter v. King, 2024 U.S. Dist. LEXIS 93881, * 15-16 Recognizing that Mr. Hunter has a liberty interest in exculpatory evidence related to a false identification based on a forensic scientist's fraudulent lab practices, this Court of Appeals should conclude that the State had an obligation to comply with the principles of Brady v. Maryland, 373 U.S. 83 (1963) and properly disclose its evidence of a false identification of Mr. Hunter and his actual innocence. Indubitably, due process requires a prosecutor to disclose material exculpatory evidence to the defendant before trial and in postconviction proceedings when fraud upon the court involves the State's star forensic expert – Defendant Woods.

Even assuming arguendo that a criminal defendant that is found guilty after a fair trial lacks the same liberty interests as a free man; if the extant judgment is the product of fraud, this Brady right to exculpatory evidence should continue into the postconviction phase; thus § 1983 was a viable mechanism here. Obviously at trial, the defendant is presumed innocent and may demand that the government prove its case beyond a reasonable doubt. But "[o]nce a defendant has been afforded

a fair trial and convicted of the offense for which he was charged, the presumption of innocence disappears." Herrera, 506 U.S. 390, 399 (1993). But in this case, there was no fair process, in that, the Prosecution and law enforcement presented a false identification. "Given a[n] [in]valid conviction, the criminal defendant has been [un]constitutionally deprived of his liberty." Dumschat, 452 U.S. 458, 464 (1981)

Mr. Hunter's right to due process is thus parallel to a trial right, and therefore must be analyzed in light of the fact he was found guilty based on fraud—an unfair trial, and by extension t retains full interest in post-conviction relief. Brady's framework should, therefore, continue here, and § 1983 is a viable means of forcing the Defendants to produce this exculpatory evidence.

Even then, Colorado State's procedures for postconviction relief "offends [] principle[s] of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental," and "transgresses [] recognized principle of fundamental fairness in operation." Medina v. California, 505 U.S. 437, 446 (1992) (internal quotation marks omitted); see Herrera, supra, at 407-408 (applying Medina to postconviction relief for actual innocence); Pennsylvania v. Finley, 481 U.S. 551, 556 (1987) (postconviction relief procedures are constitutional if they "compor[t] with fundamental fairness"). Federal courts may upset a State's postconviction relief

procedures only if they are fundamentally inadequate to vindicate the substantive rights provided. CBI's  as a corollary to this rule, systemic fraud an this widespread concealment of exculpatory evidence - denial of fair process, as well as habit of framing citizens presents the quintessential in which Colorado's postconviction procedures should be subject to section 1983 relief and protection of citizens from corrupt state process.

The procedures set forth in Colorado Rules of Criminal Procedure have allowed the State's key forensic scientistic expert to frame numerous citizens and conceal her misconduct and provides no legal requirement that the CBI turnover its internal audit reports that prove that Mr. Hunter's identification is invalid, and that Defendant Yvonne M. Woods framed him. The Criminal Rules of Procedure fail to impose a continuing discovery obligation in the face of fraud-upon-the-Court and a complete denial of fair trial and provide no specific mechanism for retesting of DNA evidence and compulsion of exculpatory evidence from private citizens that have been fired for misconduct; therefore, begging the discovery tools and injunctive authority applicable to section 1983

Colorado provides no substantive mechanism to compel evidence of actual innocence from the CBI and other parties that actively refuse to provide access to

exculpatory evidence. Therefore, section 1983 is a critical tool to correct the underlying miscarriage of justice.

### d. Actual innocence exception under 28 U.S.C. 2254 is unaffected by a State Court judgment.

It is well-settled that the Rooker-Feldman doctrine does not touch the writ of habeas corpus. see Plyier v. Moore, 129 F.3d 728, 732 (4th Cir. 1997); Ritter v. Ross, 992 F.2d 750, 753 (7th Cir. 1993); Blake v. Papadakos, 953 F.2d 68, 71 n.2 (3d Cir. 1992). Indeed, federal habeas-corpus law turns Rooker-Feldman on its head. Rather than leaving state court judgments undisturbed, it provides expressly for federal collateral review of final state court judgments, see, e.g., 28 U.S.C. 2254, and requires exhaustion of state remedies as a precondition for federal relief, see 28 U.S.C. 2254(b)(l)(A). As we shall discuss when examining the merits of this appeal, through the statutory writ of habeas corpus Congress has created a comprehensive system of federal collateral review of state court criminal judgments. Thus, habeas corpus is not an "exception" to Rooker-Feldman, but a procedure with roots in statutory jurisdiction parallel to - and in no way precluded by - the doctrine.

So, too, it is with civil actions for deprivation of rights under 42 U.S.C 1983, in apparent contradiction to the Rooker-Feldman theory, Civil Rights actions under

§ 1983 are empowered to avoid state judgments. Thus, final judgments in state courts are not necessarily preclusive in United States District courts.

Relevant case law "severely limits the federal action a state prisoner may bring for DNA testing." Skinner v. Switzer, 562 U. S. 521, 525, 131 S. Ct. 1289, 179 L. Ed. 2d 233 (2011). The Court has "rejected the extension of substantive due process to this area and left slim room for the prisoner to show that the governing state law denies him procedural due process." Ibid. (citation omitted); see District Attorney's Office for Third Judicial Dist. v. Osborne, 557 U. S. 52, 69, 72, 129 S. Ct. 2308, 174 L. Ed. 2d 38 (2009). Irrespective, section 1983 is a tenable mode of establishing actual innocence through DNA where a state and its officials seek to obstruct a gateway claim.

### i. Colorado's holding and statutory law conflicts with Schlup v. Delo, 513 U.S. 298, 328-29 (1995) and McQuiggin v. Perkins, 569 U.S. 383, 387 (2013)'s gateway claim.

To the extent the Court of Appeal's is good law and a basis for denial of DNA testing, Colorado law and DNA statute conflict with federal law; and therefore, is void.

It is well established that, under the supremacy clause, federal law preempts conflicting state law, nullifying it to the extent that it conflicts with the federal law.

U.S. Const., art. VI. Thayer v. McDonald, 781 P.2d 190, 190-91 (1989) (Defendants failed to assert the doctrine of federal preemption at the trial court level; however, the defense of lack of subject matter jurisdiction may be asserted at any time, including during an appeal.)

Congress' power to preempt state and local law derives from the Supremacy Clause of the United States Constitution, which provides "the Laws of the United States . . . shall be the supreme Law of the Land . . . any thing in the Constitution or Laws of any State to the Contrary notwithstanding." Art. VI, cl. 2. Preemption may occur in three situations: (l) express preemption, which occurs when the language of the federal statute reveals an express congressional intent to preempt state law (plaintiffs concede express preemption is not at issue here); (2) field preemption, which occurs when the federal scheme of regulation is so pervasive that Congress must have intended to leave no room for a State to supplement it; and (3) conflict preemption, which occurs either when compliance with both the federal and state laws is a physical impossibility, or when the state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress. see Barnett Bank of Marion County v. Nelson, 517 U.S. 25, 31, 134 L. Ed. 2d 237, 116

S. ct. 1103 (1996); United States v. City & County of Denver, 100 F.3d 1509, 1512 (10th Cir. 1996). Conflict preemption controls, here.

Although the supremacy clause "is not a source of any federal right," it "'secures' federal rights by according to them priority whenever they come in conflict with state law. " Golden State Transit Corp v. City of Los Angeles, 493 U.S. 103, 107, 110 S.Ct. 444, 449, 107 L.Ed.2d 420, 428 (1989).

The purpose of the preemption doctrine is to establish a priority between potentially conflicting laws enacted by various levels of government. Board of County Commissioners v. Bowen/Edwards Associates, Inc., 830 P.2d 1045 (Colo. 1992). The underlying rationale of that doctrine is that the supremacy clause invalidates state laws that "interfere with, or are contrary to, the laws of Congress." Brubaker v. Board of County Commissioners, 652 P.2d 1050, 1054 (Colo. 1982). See People v. Deitchman, 695 P.2d 1146 (Colo. 1985) (supremacy clause prohibits states from enacting legislation contrary to or inconsistent with the federal law).

Under Schlup v. Delo, 513 U.S. 298, 328-29 (1995) and McQuiggins v. Perkins, 569 U.S. 383, 387 (2013) a petitioner who has committed a procedural default may be excused from the default and obtain federal review of his constitutional claims only by showing "cause" and "prejudice," by "demonstrat[ing]

…that failure to consider the claims will result in a fundamental miscarriage of justice". Actual innocence is a gateway claim to this procedural default and may be established through DNA testing. As the Court has explained, "the principles of comity and finality that inform the concepts of cause and prejudice 'must yield to the imperative of correcting a fundamentally unjust incarceration.' " Murray v. Carrier, 477 U.S. at 496 (quoting Engle v. Isaac, 456 U.S. at 135). Accord House v. Bell, 547 U.S. 518, 536 (2006) ("general rule" that "claims forfeited under state law may support federal habeas relief only if the prisoner demonstrates cause for the default and prejudice from the asserted error . . . is not . . . unqualified"; underlying " 'principles of comity and finality' " must " 'yield to the imperative of correcting a fundamentally unjust incarceration' " so as to allow federal courts " to 'balance the societal interests in finality, comity, and conservation of scarce judicial resources with the individual interest in justice that arises in the extraordinary case' "). And, here, Colorado's laws are obstructing this actual innocence process by impeding section 1983 DNA testing.

In Murray v. Carrier, 477 U.S. 478 (1986), the Supreme Court recognized a narrow exception to the cause requirement where a constitutional violation has 'probably resulted' in the conviction of one who is 'actually innocent' of the substantive offense. Id., at 496; accord, Schlup v. Delo, 513 U.S. 298, 1 15 S. Ct.

851, 130 L. Ed.2d 808 (1995). This actual innocence exception is the focus of this litigation, not the State Court's void holding based on a repealed statute.

The denial of section 1983 DNA testing to establish actual innocence under Schlup v. Delo, 513 U.S. 298, 328-29 (1995) and McQuiggins v. Perkins, 569 U.S. 383, 387 (2013)'s gateway exception based on a Colorado Court of Appeals holding and/or a repealed Colorado DNA statute clearly violates the Supremacy Clause of the United States Constitution. U.S. Const. art. 6, cl. 2 (supremacy clause) Being such, the State Court holding is void for want of jurisdiction. Besides, the notion that Mr. Hunter sought to use a statutory mechanism to procure access to DNA evidence to collaterally attack his conviction has no legal or lawful effect on his decision to demand DNA testing and production of exculpatory evidence to prove his innocence as an actual innocence gateway claim or exception to a procedural bar. And any position or holding that it does would render these state holdings or law a nullity under federal preemption.

### e. Bad faith prosecution exception is actionable under §1983.

Recognizing that a 1983 comes within the "expressly authorized" exception of the anti-injunction statute, and that Congress's creation of a specific and unique federal right or remedy, enforceable in a federal court of equity, that could be

34

frustrated if the federal court were not empowered to enjoin a state court proceeding, supports a need for federal intervention and the stay of a state court proceedings. See Toucey, supra, at 132-134; Kline v. Burke Construction Co., 260 U.S. 226; Providence & N. Y S. S. co. v. Hill Mfg. co., 109 U.S. 578, 599; Treinies v. Sunshine Mining co., 308 U.S. 66, 78; Kalb v. Feuerstein, 308 U.S. 433; Bowles v. Willingham, 321 U.S. 503. For this reason, it is difficult to understand how, the Trial Court could find that the Defendant's conduct failed to support a basis for 42 U.S.C. 1983 relief.

Section 1983 was originally § 1 of the Civil Rights Act of 1871. 17 Stat. 13. It was "modeled" on § 2 of the Civil Rights Act of 1866, 14 Stat. 27, and was ratified for the specific purpose of "enforc[ing] the Provisions of the Founeenth Amendment." **1**7 Stat. 13. The predecessor of S 1983 was thus an important part of the basic alteration in our federal system wrought in the Reconstruction era through federal legislation and constitutional amendment. As a result of the new structure of law that emerged in the post-Civil War era - and especially of the Fourteenth Amendment, which was its centerpiece the role of the Federal Government as a guarantor of basic federal rights against state power was clearly established. Monroe v. Pape, 365 U.s. 167; McNeese v. Board of Education, 373 U.S. 668; Shelley v.

Kraemer, 334 U.S. 1; Zwickler v. Koota, 389 U.S. 241, 245-249; H. Flack, The Adoption of the Fourteenth Amendment (1908); J. Tenbroek, The Anti-Slavery Origins of the Fourteenth Amendment (1951). Section 1983 opened the federal courts to private citizens, including Mr. Hunter, offering a uniquely federal remedy against incursions under the claimed authority of state law upon rights secured by the Constitution and laws of the Nation.

It is clear from the legislative debates surrounding passage of 1983's predecessor that the Act was intended to enforce the provisions of the Fourteenth Amendment "against State action, . . .whether that action be executive, legislative, or judicial." Ex parte Virginia, 100 U.S. 339, 346 (emphasis supplied). Proponents of the legislation noted that state courts were being used to harass and injure individuals, just like Mr. Hunter, either because the state courts were powerless to stop deprivations or were in league with those who were bent upon abrogation of federally protected rights.

Senator Osborn's statement ring loudly here: "If the State courts had proven themselves competent to suppress the local disorders, or to maintain law and order, we should not have been called upon to legislate . . . . We are driven by existing facts to provide for the several states in the South what they have been unable to

36

fully provide for themselves: i. e., the full and complete administration of justice in the courts. And the courts with reference to which we legislate must be the United States courts." Id., at 653.

> Representative Perry's position espoused a similar position:

> > "Sheriffs, having eyes to see, see not; judges, having ears to hear, hear not; witnesses conceal the truth or falsify it; grand and petit juries act as if they might be accomplices. . . .All the apparatus and machinery of civil government, all the processes of justice, skulk away as if government and justice were crimes and feared detection. Among the most dangerous things an injured party can do is to appeal to justice. "

Id., at App. 78, and is particularly relevant here. Mr. Hunter is innocent, but everyone is covering their eyes.

This legislative history makes evident that Congress clearly conceived that it was altering the relationship between the States and the Nation with respect to the protection of federally created rights; it was concerned that state instrumentalities could not protect those rights; it realized that state officers might, in fact, be antipathetic to the vindication of those rights; and it believed that these failings extended to the state courts. This dynamic has not changed, and § 1983 is required,

here, to show actual innocence for purpose of state and Federal Habeas Corpus review.

## CONCLUSION

The Trial Court's Order of dismissal was both error of law and an erroneous finding of facts; therefore, the Tenth Circuit Court of Appeals should rescind the extant judgment and remand for further proceedings on the merits.

## CERTIFICATE OF DIGITAL SUBMISSION

I hereby certify that: I have not redacted any documents; and this document is submitted in Digital PDF, has been scanned for viruses with McAfee Security, and is free of viruses.

## CERTIFICATION OF EXACT COPIES

I hereby certify that: the attached copies submitted to the Court are exact copies of the electronically submitted version.

Respectfully submitted this 9th day of September 2024.

s/ Kenneth Mark Burton
_____
Kenneth Mark Burton
The Law Office of Mark Burton, PC
1175 Osage Street, Suite 210
Denver, CO 80204
Phone 303.517.1187
Fax 303.379.3922
burtonslaw2000@yahoo.com

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that the foregoing action was filed with the Clerk of Court on September 9, 2024, and that a true and correct copy was electronically sent to the interested parties via PACER's electronic court filing system.

Mr. Steven W. Boatright: swb@omhdlaw.com
Kelley Marie Dziedzic: kelley.dziedzic@coag.gov
Ms. Rebecca Klymkowsky: rklymkow@jeffco.us, bmccarte@jeffco.us
Scott Neckers: san@omhlaw.com, jp@omhlaw.com, mc@omhlaw.com
Ms. Amy Lenore Padden: apadden@jeffco.us, wgriego@jeffco.us
Sarah Anne Thomas: sat@omhlaw.com
Mr. Joshua G. Urquhart: joshua.urquhart@coag.gov, elle.dimuro@coag.gov
Mr. Cole Jacob Woodward: cole.woodward@coag.gov, james.mules@coag.gov, elle.dimuro@coag.gov

/s Kenneth Mark Burton

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 23-cv-02989-DDD-MEH

JAMES HUNTER,

**Plaintiff,**

v.

ALEXIS KING District Attorney for the 1 st Judicial District, in her official
    capacity.

CHRIS SCHAFFER, Director of the Colorado Bureau of Investigation, in his
    official capacity,

REGGIE MARINELLI, Sheriff of the Jefferson County Sheriff's Department, in his official
    capacity,

CHIEF SMITH, Chief of Police for the Lakewood Police Department, in his official
    capacity; and

YVONNE M. WOODS Officer, laboratory technician of the Colorado Bureau of Investigation, in
    her individual capacity.

**Defendants.**

---

**AMENDED COMPLAINT**

---

**INTRODUCTION**

1.    The cause of action in this case is the denial of due process, and the request for the fair

administration of justice through proper access to evidence and testing that could substantiate the

actual and factual innocence of the Plaintiff.  Mr. James Hunter, the Plaintiff, is a 64-year-old

gentleman that has maintained his innocence for over 21 years. The dynamics of this case meet

the precise circumstances in which the State of Colorado should yield in the interest of justice

and allow Mr. Hunter to have access to DNA and print identification evidence to substantiate his

actual and factual innocence.

2.      The record is patently clear that Mr. Hunter was prosecuted and tried based on fabricated

and false evidence. This action is based on the complete denial of access to evidence that is

currently in the Defendants' control that will substantiate Mr. Hunters actual innocence.

Specifically, there are approximately 21 different pieces of evidence, including a rape kit, that are

in the custody and control of the Defendants, and these items have not been tested. None of these

items were subjected to advanced scientific testing that was not available 20 years ago but is

available today.  There is biological evidence that has never been analyzed that exists and each of

the noted pieces of evidence will prove Mr. Hunter's innocence. As such, Mr. Hunter has a due

process right to access and test this evidence.

3.      An immediate threat exists that the Defendants will destroy or alter the subject evidence due

to the recent identification of an alternative suspect, who was recently convicted of a similar crime

with the same *modus operandi* used in Mr. Hunter's case. The identification of finger/palm prints

that would have also proven Mr. Hunter's innocence has recently disappeared and then reappeared

from evidence storage without legal authority or proper accounting of the chain of custody. This

threat of destruction of evidence is, upon belief, obviously designed to stonewall any current

collateral attack and conceal potential liability for the wrongful conviction of an innocent man.

Therefore, the Federal Court should, in the interest of justice, issue an immediate preservation

order and, thereafter, issue an order directing the Defendants (herein) to produce all evidence for

DNA and print identification testing to allow Mr. Hunter to confirm and substantiate his actual innocence and show an exception to any procedural restriction premised on Mr. Hunter's claim that any procedural claim by the Defendants amounts to a miscarriage of justice exception.

## PARTIES

4.     At all times pertinent to the complaint the Plaintiff James Hunter was a citizen of the United States and resident of the State of Colorado, and currently resides at: 275 Hwy 50, Canon City, CO. 81215.

5.     Defendant Alexis King is a United States citizen and resident of the State of Colorado. At all times relevant to this action, the Defendant King was acting under the color of law in her capacity as the District Attorney of the Jefferson County District Attorney's Officer, and currently conducts business at: 500 Jefferson County Parkway, Golden, CO. 80401. Defendant King is the administrative head and official policy maker of the Jefferson County District Attorney's Office and has authority to issue preservation orders with respect to all constitutionally material evidence currently in the custody of all law enforcement agencies in the jurisdiction of Jefferson County. Upon belief, Defendant King is aware of Mr. Hunter's actual and factual innocence but has conspired with local law enforcement to prevent the testing of all biological evidence that could substantiate Mr. Hunter's actual innocence with the intent and understanding to prevent a collateral attack; thereby, depriving him of due process guaranteed under the Fourteenth Amendment. Defendant King is being sued in her official capacity.

6.     Defendant Chris Schaffer is a United States citizen and resident of the State of Colorado. At all times relevant to this action, Defendant Schaffer was acting under the color of law in his

capacity as the Director of the Colorado Bureau of Investigation ("CBI"), and currently conducts business at: 6000 54th Ave., Arvada, CO. 81002. Defendant Schaffer is the administrative head and official policy maker of CBI and currently has authority to issue a preservation order with respect to all constitutionally material evidence currently in its custody and order the production of this evidence for independent DNA testing by the Defendant's legal team. Upon belief, Defendant Schaffer is aware of Mr. Hunter's actual and factual innocence but has conspired with local law enforcement to prevent the testing of all biological evidence that could substantiate Mr. Hunter's actual innocence with the intent and understanding to prevent a collateral attack; thereby, depriving him of due process guaranteed under the Fourteenth Amendment. The CBI and its agents are currently concealing evidence and information regarding Woods' history of abusive forensic practices related to Mr. Hunter and hundreds of other convictions. This evidence is highly exculpatory and could very well substantiate due process claims under the *Brady v. Maryland*, 373 U.S. 83 (1963) however, Schaeffer and his staff refuse to disclose this material evidence. Defendant Schaffer is being sued in his official capacity.

7.      Defendant Reggie Marinelli is a United States citizen and resident of the State of Colorado. At all times relevant to this action, the Defendant Marinelli was acting under the color of law in his capacity as the Sheriff of the Jefferson County Sheriff's Department, and currently conducts business at: 200 Jefferson County Parkway, Golden, CO. 80401. Defendant Marinelli is the administrative head and official policymaker for the Jefferson County Sheriff's Department, and currently has authority to issue a preservation order with respect to all constitutionally material evidence currently in its custody and order the production of this evidence for independent DNA testing by the Mr. Hunters legal team. Upon belief, Defendant Marinelli is aware of Mr. Hunter's

actual and factual innocence but has conspired with local law enforcement to prevent the testing of all biological evidence that could substantiate Mr. Hunter's actual innocence with the intent and understanding to prevent a collateral attack; thereby, depriving him of due process guaranteed under the Fourteenth Amendment. Defendant Marinelli is being sued in his official capacity.

8.     Defendant Chief Smith is a United States citizen and resident of the State of Colorado. At all times relevant to this action, the Defendant Smith was acting under the color of law in his capacity as the Chief of Police of the Lakewood Police Department, and currently conducts business at: 480 S. Allison Parkway, Lakewood, Colorado 80226. Defendant Smith is the administrative head and official policymaker for the Lakewood Police Department, and currently has authority to issue a preservation order with respect to all constitutionally material evidence currently in its custody and order the production of this evidence for independent DNA testing by the Mr. Hunters legal team. Upon belief, Defendant Smith is aware of Mr. Hunter's actual and factual innocence but has conspired with local law enforcement to prevent the testing of all biological evidence that could substantiate Mr. Hunter's actual innocence with the intent and understanding to prevent a collateral attack; thereby, depriving him of due process guaranteed under the Fourteenth Amendment. Defendant Smith is being sued in his official capacity.

9.     Defendant Yvonne M. Woods is a United States citizen and resident of the State of Colorado. At all times relevant to this action, the Defendant Woods was acting under the color of law in her capacity as an officer of CBI, and conducted business at: 6000 54th Ave., Arvada, CO. 81002. Defendant Woods was employed as a Colorado Bureau of Investigation (CBI) technician working for the state of Colorado. Upon information, Ms. Woods was the lead technician directing the

analytical test on hairs and other DNA sources that were used to convict Mr. Hunter and may have custody and control of material evidence that may be tested for DNA. Woods is currently privy to her systemic and abusive forensic practices and is currently concealing details of her fabrication of evidence against Mr. Hunter. This fraudulent concealment includes, but is not limited to, concealment of prior misconduct in hundreds of other cases involving forensic testing and collection of evidence that could support potential *Brady* claims under the 5th and 14th Amendments. As such, Ms. Woods is a material witness that has highly exculpatory information in her possession and control that would be relevant to Mr. Hunter's actual and factual innocence. Therefore, Mr. Hunter has a due process right to discover and compel information from Ms. Woods. Upon belief, Defendant Woods is aware of Mr. Hunter's actual and factual innocence but has conspired with local law enforcement to prevent the testing of all biological evidence that could substantiate Mr. Hunter's actual innocence with the intent and understanding to prevent a collateral attack; thereby, depriving him of due process guaranteed under the Fourteenth Amendment. Defendant Woods is being sued in her official capacity.

## JURISDICTION

10.    This action arises under the Constitution of the United States and Title 42 U.S.C. 1983. Jurisdiction is conferred upon the Court pursuant to 28 U.S.C. 1331, 28 U.S.C. 2201. Plaintiffs claim for injunctive and declaratory relief is authorized under 28 U.S.C. 2283, 2284 and Fed.R.Civ.P. 57 and 65.

11.    Venue is proper in this Court pursuant to 28 U.S.C. 1391(b), as all the events giving rise to this action occurred in the State of Colorado.

## FACTUAL BACKGROUND

### Mr. Hunter's Conviction in Jefferson County, Case Number 02CR354

12.     The Prosecution arrested and charged Mr. Hunter with second-degree burglary, and sexual assault. Mr. Hunter was convicted of second-degree burglary, and the sexual assault. charge The Prosecution's theory of case was that Mr. Hunter unlawfully entered the premises of RH, his neighbor, while wearing a mask, and sexually assaulted her and her daughter.

13.     It is alleged that on April 23, 2002, the victim R.H. was in her trailer at: 5555 West 16th Avenue in Lakewood, Colorado, when around 1:00 a.m. she saw a figure standing in her hall. R.H. thought he had pulled a tube sock over his face, but still could not identify the perpetrator.

14.     A struggle ensued between the perpetrator and R.H. Initially, R.H. thought the perpetrator's voice sounded like her neighbor (Hunter), but later recanted this statement, stating that she did not think it was him. The suspect robbed R.H. of money and sexually assaulted her repeatedly, leaving an immense volume of DNA evidence on the victims clothing and other items in the residence. Unfortunately, this skin cell DNA could not be tested at the time due to undeveloped science in 2002. However, there were several hairs collected from the crime scene. During the early part of the investigation an expert witness for the prosecution mistakenly asserted that one of the discovered hairs tied Mr. Hunter to the crime.

15.     Mr. Hunter was arrested and charged with the underlying crimes. However, this criminal action was dismissed at a preliminary hearing due to the absence of evidence linking the Plaintiff to the crime scene.  The dismissal was required since the evidence used to establish probable cause proved to be inaccurate, which effectively left the prosecution with no evidence supporting the charges.

16.    This false evidence (hairs) was microscopically examined by CBI. Defendant Yvonne Woods and while cooperating with DA Jensen and Det. Jameson. Woods initially made a microscopic comparison of the hairs and stated that this evidence was a match. The statement by Woods that the hair was "microscopically consistent" was a mischaracterized claim about the hair evidence. [Trans., 01/15/2004, p. 102]. In fact, the "match" referred to by the Woods was from a preliminary test, which the chemist admitted was not a match for DNA and led to the false positive. Recognizing this error, Woods confessed to the court this was a "blow to her ego."

17.    This evidence of a match was initially used to establish probable cause for an arrest warrant, but the court later dismissed the case after recognizing that the microscopic match was false, and for the lack of any other evidence that established probable cause.  When the hair evidence was submitted for a more exact examination it was discovered that the hairs belonged to the victim R.H.

18.    Ten months after the crime, allegedly new evidence of a hair surfaced. There is no verification or record of collection of this hair from the crime scene by the Crime Scene Investigation Unit. The evidence labeling and packaging was not created by the responding CSI officers of Lakewood Police Department. Technicians from CBI could not confirm the evidentiary source of the hairs, suggesting that this evidence had to have been manufactured from an alternative source. Moreover, the subject hair evidence was discovered and logged into evidence ten months after the crime scene investigation, and the only person identified as the creator of the hair pack was Detective Jameson.  It is most unusual in the investigative and evidence gathering process that a lead detective intervenes between the CSI and the CBI.  The intervention is even more questionable when neither the CBI or the CSI can explain the background or source of the hair identification process.  There is no verification that the evidence pack holding this hair was created by the CSI and there is no evidence that CBI collected this hair evidence from the location of the

crime scene. The lack of source verification and lack of crime scene origination further suggested fabrication.

19.     In addition, there is no lawful explanation as to how this hair evidence came into existence. This hair evidence was taken from another hair pack that was in the custody and control of CBI, and used to create a separate hair evidence pack by Detective Jameson that would be identified as collected from the crime scene. DNA testing revealed that this single hair belonged to Mr. Hunter and was falsely characterized as collected from the sheet found on the victim's couch. The evidence logs reveal that Detective Jameson and Wilson removed this hair evidence from the hair evidence collected directly from Mr. Hunter during the initial investigation, which afforded the Defendants access to hair evidence and the opportunity to fabricate probable cause. This gross injustice was ignored by the Jefferson County District Court and although not the subject of this litigation and is only offered to establish the serious threat of further destruction and fabrication of evidence required to prove Mr. Hunter's innocence. Currently, Mr. Hunter requires testing of DNA evidence collected by the Defendants (herein) to prove his actual and factual innocence.

20.     Plaintiff would like to alert the Court to a recent announcement by the Colorado Bureau of Investigation that one of their top forensic scientists has been suspended and is under investigation for "anomalies" in DNA testing over the past 29 years. Yvonne Woods is the name of the scientist that is under investigation.    This was the lead scientist in Plaintiff's criminal case and the request in this Complaint for further DNA testing will directly impact opinions and conclusions put forth by Ms. Woods.  This scientist is also the same individual that made a false conclusion that hairs examined under a microscope in this case were the Plaintiffs.  After a more technical examination all four hairs belonged to the victim and none belonged to the Defendant.

21.   On December 12, 2002, a grand jury convened, and Mr. Hunter was ultimately indicted based on the same crimes. This indictment occurred seven days after Det. Wilson and Detective Jameson conspired to fabricate hair evidence and presented this false evidence to a grand jury. Plaintiff Hunter has consistently maintained his actual and factual innocence. According to a lab report which was the relevant exhibits to the petition, on 12-5-02 Det. Jameson separated a hair, sample item # 17-12. Then put the hair in a new packet and had Det. Wilson return the hair. This evidence was used to indict Mr. Hunter at the Grand Jury. From the prosecutions own evidence, it can be shown that the questionably created hair pact was fabricated and manufactured from the previous sample Mr. Hunter voluntarily provided. See attached Exhibit signed by agent S. Mamolejo 5665.

22.   On July 2, 2002, the packet was booked by CSI into the care, custody, and control of the evidence custodian for the City of Lakewood Colorado Police Department. On December 5, 2002, hair packet 2 was received and there is no one that can confirm the exact date when hair packet 2 was received. There is no evidence that hair packet 2 was created by CSI at the time of collection and logging of evidence gathered by CSI from the crime scene. On December 12, 2002, the report implicating the Plaintiff as the perpetrator of the criminal event was created by lab technician Bernardi. This evidence was latter the piece of evidence, that Yvonne Woods examined and tested, that led to Plaintiffs conviction.

23.   Det. Wilson handled the hair/fiber packet without logging out the evidence on 12-12-02 to use for the grand jury indictment. The hair packet was returned by Wilson, and it was noted by lab tech Bernardi that there were now two hair/fiber packets, and the new evidence wasn't marked. Because of the fabrication of new evidence, evidence item 17-12 should have been suppressed.

24.     Mr. Hunter's defense was that he was not the perpetrator. Had the handling of the hair packet evidence been known at the time of trial the defense would have been expanded to include claims that any DNA evidence was unreliable due to it being fabricated and planted by Jameson/Wilson. The issue surrounding this hair pack 2 should have disposed of the case in the same manner as the case was dismissed after the initial bogus hair examination was realized.

25.     There was a further claim that CBI developed a DNA mixture that according to the technology used by CBI contained a DNA mixture of the victim and Mr. Hunter. Mr. Hunter has pursued motions in state court to obtain DNA re-testing of the mixture DNA evidence allegedly collected from the crime scene. The motions for re-testing were made under C.R.S. 18-1-413. Mr. Hunter's post-conviction motion was to have the DNA tested with short tandem repeat of the Y chromosome (Y-STR). There have been substantive advancements in DNA mixture testing and what 20 years ago seemed unreliable has proven with new technology to be reliable.

26.     Plaintiff has asserted in the referenced motions that the advanced DNA testing would likely exonerate him, but retesting was denied. Plaintiff has always maintained his innocence; that he did not commit this crime.

27.     During the investigation, substantive quality prints were lifted from the point of forced entry into the victim's residence. These prints did not match Mr. Hunters prints. The lifted entry way prints were determined by CSI persons to likely be the suspect prints who committed the crime. After repeated requests to have the prints run through the Automated Fingerprint Identification System (AFIS), CBI has not made any comparison through AFIS since April of 2002 all the way to now September of 2023, with no action being taken.

28.     There were random prints found inside the residence. None of the prints matched Mr. Hunter or the victim. No comparison was made between the random prints and the prints lifted from the point of entry.

29.     Defendant Jensen represented in filings in the State Court that he put the prints though AFIS. This has proven to be a false statement to the court by an officer of the court. It has been discovered by the parties assisting Mr. Hunter that there is no report of any AFIS database search. This print is likely the actual suspect of this crime. Mr. Hunter has further given the Jefferson County District Attorney's office the name of parties that could be the source of the prints. One of the parties was present in Colorado on the night of the crime charged against Mr. Hunter. This individual is currently serving a sexual assault sentence in the State of Missouri for a sex crime committed after the crime charged against Mr. Hunter. The crime in Missouri has aspects of the crime that are very similar and unique to the crime committed in Mr. Hunter's case. There are two other male parities that met the general description provided by the victim and were present in the immediate area at the time and on the date of the crime and the authorities refuse to run print comparison.

30.     Hunter's former Attorneys from the Innocence Project, Jud Lohnes and Jeanne Segil, have tried to work with Jefferson County District Attorney, Alexis King, from the Conviction Integrity Unit, to have this evidence tested. These requests have not been fulfilled.

31.     As stated above Mr. Hunters post-conviction motion was to have the DNA tested with short tandem repeat of the Y chromosome (Y-STR) and the finger/palm print run through AFIS. Plaintiff understands that the DNA retest concerns technology that was not known at the time of his conviction and this request relates to new technology. Processing the prints against prints of suggested parties with known prints on file and doing an AFIS search 20 years ago was not asking the State to explore new technology. Prints have served as the basis of crime scene investigations long before the CSI conducted the gathering of evidence in this case. Falsely stating that an AFIS

search had been requested and then when learning of the false request and continuing to refuse to run the test only compounds and extends the wrongful deprivation and violation of the Mr. Hunter's Constitutional rights without logical reason for not taking corrective actions and run the print requests.

32.    Mr. Hunters complaint is the state courts are denying him procedural due process, and the Colorado post-conviction DNA statute is unconstitutional as construed by the Colorado courts.

33.    Det. Richard Tewes destroyed all his written notes from the crime scene after being told to do so by Det. Jameson. [TR. 1-14-04 p 140-141].

34.    Mr. Hunter's allegations are Prosecutor Jenson and Detectives, Jameson, Tewes, and Wilson, either knowing, negligently or in conspiracy with one another fabricated, falsified, and manufactured this DNA evidence. The evidence was used in the criminal case against him, and the use of the evidence deprived Hunter of a fair trial. Without the fabricated evidence the sentence would be invalidated or called into doubt. Running the prints and identifying an alternate suspect would have resulted in charges being dismissed.

35.    Mr. Hunter further states that refusal or denial to run the prints as requested would amount to verification and corroboration that the State provocateurs violated multiple State and Federal Constitutional rights guaranteed to the Plaintiff.

**Mr. Hunter Has Made Good Faith Efforts to Gain Access to The Subject Evidence, But the Defendants Continue to Stonewall Access and DNA Testing Which Has and Continues to Deprive Him of a Liberty Interest in Fairly Collaterally Attacking His Conviction Based on the Unconstitutionality of the Judgment.**

36.    Plaintiff has timely exhausted all available judicial remedies prior to filing this complaint but continues to attempt to collaterally attack his conviction based on his factual and actual

innocence. Unfortunately, the Defendants continue to deprive him of fair access to constitutionally mandated production of material evidence that if tested could prove his innocence.

37.     More specifically, Mr. Hunter filed a Colorado Criminal Rule of Criminal Procedure Rule 35(c) petition, which was denied by the Trial Court in Jefferson County District Court. This denial of post-conviction relief was appealed to the Colorado Court of Appeals, and subsequently an Order was issued affirming the judgment. A Writ of Certiorari was then filed with the Colorado Supreme Court.

38.     In the underlying post-conviction action, on March 18, 2020, Mr. Hunter raised his actual innocence claim and requested complete and advanced DNA testing of any evidence in the custody and control of the State of Colorado. This request was unfortunately denied by the Trial Court on March 26, 2020.

39.     On March 24, 2022, a writ of certiorari was filed with the Colorado Supreme Court. On May 23, 2022, the court denied the writ in case No. 22SC220.

**The Statute of Limitations and Justifiability of the Underlying Action Favor Review.**

40.     Hunter filed this complaint within two years of the court's denial of Certiorari in case no. 22SC220. *See Reed v. Goertz, 143 S. Ct. 955 (April 19, 2023)* (Petitioner's 1983 claim, which raised a procedural due process challenge to post-conviction DNA testing law, was timely because the statute of limitations began to run when the Texas Court of Criminal Appeals denied petitioner' s motion for rehearing.)

41.     Thus, this complaint is timely made under the rational of *Reed v. Goertz, Id. at 962* ("When a prisoner pursues state post-conviction DNA testing through the state-provided litigation process,

the statute of limitations for a 42 U.S.C.S. 1983 procedural due process claim begins to run when the state litigation ends.").

42.     Moreover, a controversy exists with respect to the constitutionality of the Defendant's denial of fair access to constitutional material evidence needed to substantiate Mr. Hunter's actual and factual innocence and establish an exception to any procedural bar based on his actual and factual innocence—miscarriage of justice exception.

**FIRST CLAIM FOR RELIEF
AND SUPPORTING FACTUAL ALLEGATIONS**
**42 U.S.C. 1983—Denial of Due Process—14th Amendment Violation**
**(Denial of Access Constitutionally Material Evidence for DNA Testing)**

43.     Plaintiff hereby incorporates by reference, for all purposes herein, paragraphs 1 through 45, as if fully set forth herein.

44.     Defendants were acting under the color of state law in their actions and inactions during all relevant times to this action.

45.     A post-conviction claim for DNA and finger/palm print testing is properly pursued in a 42 U.S.C. 1983 action. The success of this claim gains Mr. Hunter only access to untested biological evidence for DNA testing, which may prove exculpatory, inculpatory, or inconclusive. In no event will a judgment that simply orders DNA tests, here, necessarily imply the unlawfulness of the State's custody. *Skinner v. Switzer, 562 U. S. 521, 525, 131 S. ct. 1289, 179 L. Ed. 2d 233 (2011).* As such, the Heck rule has no applicability here. See *Heck v. Humphrey, 512 U.S. 477, 114 S. Ct. 2364, 129L. Ed. 2d 383 (1994).*

46.     A procedural due process claim consists of two elements: (i) deprivation by state action of a protected interest in life, liberty, or property, and (ii) inadequate state process. *Reed v. Goertz, 143 S. Ct. 955, 961 (April 19, 2023).*

### Deprivation of Protected Liberty Interest in DNA Testing Untested Biological Evidence That Will Prove Mr. Hunter's Innocence.

47.      Mr. Hunter has a liberty interest in utilizing state procedures to obtain reversal of his conviction and/or to obtain a pardon or reduction of sentence in clemency proceedings with the Governor of Colorado under the Fourteenth Amendment to the constitution of the United States.

48.      The access to biological evidence and testing of this evidence was never properly afforded to Mr. Hunter due to the conspirator and abusive conduct of the Defendants, and Defense Counsel ineffectiveness. Moreover, the development of DNA science from the outset of this litigation was undeveloped and therefore unavailable to Mr. Hunter. Therefore, any lack of testing of the subject's biological evidence is not due to lack of diligence on Mr. Hunter's part.

### Inadequate State Process for Testing Evidence for DNA Through No Fault of Mr. Hunter.

49.      The State of Colorado is currently using a false narrative and circumventing statutory law to procedurally bar Mr. Hunter from DNA testing untested biological evidence that will prove his factual and actual innocence. This circumvention of Colorado law has effectively deprived Mr. Hunter access to the very evidence needed to prove his factual and actual innocence. Moreover, this sadistic and malicious conduct is upon belief pretextual, and designed to fabricate a basis to destroy and conceal constitutionally material evidence that is very likely to prove Mr. Hunter's innocence; thus, presenting an imminent threat of a constitutional violation. Therefore, the Defendants and the State of Colorado's refusal to release the listed biological evidence for testing has deprived Mr. Hunter of his liberty interests in utilizing state procedures to obtain reversal of

his conviction and/or to obtain a pardon or reduction of sentence in clemency proceedings with the Governor of Colorado.

50.     DNA known as Y-STR will yield a genetic profile identifying an alternative suspect Kenny Smith if subjected to testing, but thus far the Defendants have denied access to this biological evidence with the intent and understanding prevent a fair use of legal process and mechanisms to collaterally attack his conviction. Noting, this malicious prosecution and the conspirator conduct is not the subject of this litigation and is only offered to identify the motive and serious threat of destruction of evidence that necessitates a temporary restraining order preserving evidence.

51.     Evidence collected in this case is in the possession of the Defendant and their respective agencies, and has been since Hunter's trial. The evidence was not tested for Y-STR (Skin Cell) DNA at that time, which could have eliminated the Plaintiff as a contributor, therefore proving his innocence in this case. This biological evidence includes, but is not limited to:

- Rape Kit (Containing seminal fluids and other skin cell DNA from Kenny Smith the actual perpetrator).
- Ketchup Bottle (Used to sexually assault victim RH, which has skin cell DNA From Kenny Smith the actual perpetrator).
- Bodily hairs collected at the crime scene (Containing DNA from Kenny Smith the actual perpetrator).
- Rug (Containing DNA from Kenny Smith the actual perpetrator).
- Sheet (Containing DNA from Kenny Smith the actual perpetrator).
- Blankets (Containing DNA from Kenny Smith the actual perpetrator).
- Victim RH's pants and panties (Containing DNA from Kenny Smith the actual perpetrator).
- Victims RH's jacket (Containing DNA from Kenny Smith the actual perpetrator)

52.     The above identified biological evidence will link the alternative suspect to the subject sexual assault of the victim R.H. and exonerate Mr. Hunter of any wrongdoing; thus, substantiating Mr. Hunter's actual and factual innocence, which he has continuously maintained despite the

Defendants and State of Colorado's continuous efforts to stonewall the collateral attack of this. conviction, which is out of step with substantial compliance with due process of law under the Fourteenth Amendment.

53.    As required by C.R.S. 18-1-413, the evidence collected in this case can be subjected to a newer method of DNA (Skin cell) testing (Y-STR) that provides a reasonable likelihood of results. that are more accurate and probative than the results of previous DNA testing, and will prove Mr. Hunter's innocence based on skin cell evidence left on numerous items collected by the Defendants and other law enforcement that will match the DNA profile of Kenny Smith the actual perpetrator of this crime. Noting, Mr. Smith's DNA profile is currently in the Federal Combined DNA Index system (CODIS).

54.    Hunter meets all the requirements for DNA testing as required by C.R.S. 18-1-413; however, Mr. Hunter was denied due process at the state level based on a false narrative and circumvention of statutory law. In fact, Mr. Hunter respectfully asserts that the current mechanism for DNA testing under C.R.S. 18-1-413 allows an innocent citizen to be denied access to DNA evidence when a judicial official uses a false narrative to substantiate a deficiency in the pleadings, despite a duty to liberally construe the pleadings of a pro se litigant. It is unconstitutional to deny Mr. Hunter access to untested biological evidence for DNA testing when he states that he is innocent and that this biological evidence will identify the alternative suspect.

55.    The definitive identity of the perpetrator was, and remains an issue in this case, but is very likely that Kenny Smith will be identified as the alternative suspect due to his pattern of sex crime, opportunity, and tacit confession to this crime to a private investigator.

56.     The subject of DNA testing identifying Mr. Kenny Smith as the alternative suspect will prove Mr. Hunter's actual and factual innocence and undermine the existing judgment. Being such, good cause exists for the Federal Court to intervene and estop the Defendants from denying Mr. Hunter fair access to the subject biological evidence, which is likely to afford Mr. Hunter a fair review by the Governor of Jared Polis and an additional review of the unconstitutionality of this conviction based on the miscarriage of justice exception.

57.     In addition, Hunter's finger and palm prints were not matched to the suspected print found at the crime scene. These prints were supposedly sent to AFIS, but the results have never been provided to Hunter or his attorneys, which begs the question: why? It is likely because this evidence will show that when the prints impressed at the time the crime was perpetrated and that it was not Hunter. This evidence, thus, will likely prove to be exculpatory.

58.     Hunter asserts the State either suppressed the AFIS report evidence and identity of the AFIS result or they have falsified statements to the Court. Nevertheless, the Defendants are currently denying Mr. Hunter access to this evidence for proper analysis, which is currently denying him due process to the fair collateral attack of his conviction.

59.     Prints are frequently left at scenes of crimes and are reliable. The prosecution should disclose to the defense such information as it has that may reasonably be considered admissible and useful to the defense in the sense that it is probably material and exculpatory.

60.     Experts have testified that: "AFIS system is designed to search for people who have fingers that closely match the prints found at a crime scene." People v. Austin, 35 Cal.App.5th 778 (Cal. Ct. App. 2019). Thus, access to the subject print evidence is material and likely to change the results of

the underlying conviction if an analysis proves to link an alternative suspect to the crime scene, namely Mr. Kenny Smith.

**Woods and defendants' concealment of constitutional evidence effectively stonewalls collateral attack.**

61.     Currently, the state of Colorado is outraged with respect to Woods' abusive forensic testing practices, including her purported fabrications of identification evidence in the subject Hunter case. Woods has been fired and is no longer an agent of the Colorado Bureau of Investigation: However, Woods has personal knowledge with respect to the evidence in the Hunter criminal case and the testing practice used by her to identify to identify him as the alleged perpetrator. This conditionally material evidence is critical to the collateral attack of Mr. Hunter criminal conviction and is required to establish the injustice requirement under applicable clemency laws in Colorado, which provided no discovery mechanisms for collecting or compelling this exculpatory evidence.

62.     In addition, the conditionally material evidence in this equitable action is required to effectively collateral attack the extent criminal judgment in case number 2002 RC 354 (Jefferson County). Defendants Woods, Schaffer, King, Marinelli, and Smith are effetely concealing information regarding the invalidly of the identification evidence presented by the state agents Mr. Hunter with knowledge that this evidence could potentially establish a viable basis for reversal of the extant judgment. These conspiratorial efforts to stonewall ligation have directly violated Mr. Hunter's due process right to fairly, and effectively, collaterally attack his wrongful judgment.

63.     The current denial of constitutionally material evidence includes but is not limited to: (1) Wood's intentional concealment of details concerning each of the cases that she fabricated evidence

to establish the identity of the alleged perpetrator. From 2000 to 2024, and details concerning Kings, Schaffer, Smith, and Marinelli's involvement in the numerous due process violation including the concealment of these corrupt practices in the Hunter criminal case: (2) evidence of King's intentional effort to coverup Woods', and other officers', fabrications of evidence in the underlying criminal matter relater to Mr. Hunter's identification as the alleged perpetrator, and conspiracy to stonewall litigation. Given the dynamics of the underlying criminal matter this civil rights action is currently the only viable means of procuring reliable evidence of the subject due process violations: in particular, the very evidence required to establish and exception to the success to petition doctrine and collateral attack statue is currently being concealed by the defendants. The discovery in this matter will produce the evidence required to pursue the successful collateral attack at the state court level. In absence of a fair opportunity to open the doors of discovery related to the obvious due process violations, the plaintiff is currently unable to effectively enforce his constitutional right to collaterally attack his wrongful conviction.

## A.  PRAYER FOR RELIEF

64.    WHEREEFORE, Plaintiff respectfully prays that this Court enter an order:

A.  Issuing declaratory relief, declaring that the acts and omissions of defendants are in violation of Plaintiffs Due Process rights to prove his innocence and/or fairly establish a basis for post-conviction relief, and declaring the defendant's duties with respect to those rights.

   B.  Issuing injunctive relief, commanding the defendants provide Plaintiff access to the print evidence, print results and all biological evidence in their custody and control for the proper testing of DNA testing.

   C.  Any other relief this Court deems just and proper.

**Respectfully submitted,**

Dated this 9th day of February 2024

s/Kenneth Mark Burton

_____

Kenneth Mark Burton
ATTORNEYAT LAW
The Law Offices of Mark Burton,
1173 Osage Street, Suite 210
Denver CO, 80204
Phone 303.517.1187
Fax 303.379-3922
Email:  burtonslaw2000@yahoo.com

<u>**CERTIFICATE OF SERVICE**</u>

     I hereby certify that on this 9th day of February 2024 I served a true and correct copy of the foregoing: AMENDED COMPLAINT with the Clerk of the Court by CM/ECF system and to all attorneys of record.

<u>/s Kenneth Mark Burton</u>

| Owner's Name | Date of Birth | Address (Res) | | Telephone | |
|---|---|---|---|---|---|
| LPD | | Zip Code | | | ☐ (x=day) |
| | | (Bus) | | | ☐ |
| Arrestee | Date of Birth | Address (Res) | | Telephone | ☐ (x=day) |
| | | Zip Code | | | ☐ |
| | | (Bus) | | | ☐ |
| Received From | Date of Birth | Address (Res) | | Telephone | ☐ (x=day) |
| CBI | | Zip Code | | | ☐ |
| | | (Bus) | | | ☐ |

| Agent Receiving/ID Number | Date/Time Received | Date/Time Booked 1/6/03 | Location Received |
|---|---|---|---|
| S. Marmolejo 5665 | 12/5/02 1355 | 1/6/03 1500 | CBI |

| Property Technician Receiving/ID Number | Date/Time Received | Personal Receipt | Bin Number |
|---|---|---|---|
| S Marmolejo 5665 | 1/6/03 1500 | ☐ Yes   ☐ No | HA-Z22 |

| Release Items (Number) | Authorized by/ID Number | Date | Time |
|---|---|---|---|
| | | | |
| Release Items (Number) | Authorized by /ID Number | Date | Time |
| | | | |

| Item Number | Quantity | Description | Gross Weight/ Serial Number | Bin Number |
|---|---|---|---|---|
| 1 | 1 | Hair / fiber packet #2 | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

**Narrative**

Above item received from CBI. Checked in on report w/original hair + fiber packet. When tech Bernardi went to CBI on 12/26/02, she picked up a hair and fiber packet. After researching why we had (2) hair + fiber packets, was discovered that Det Jameson separated items from original packet and had Det. W/b

| Agent Signature/ID Number | Supervisor's Initials/ID Number | Investigating Agent | ☐ CBI   ☐ Tech. Services   ☐ Other |
|---|---|---|---|
| S Marmolejo 5665 | | Det. Jameson | Queried NCIC/CCIC   ☐ yes   ☐ no |

76 DPS 3 (Rev. 1/91)   take to CBI. Booked those items on this new report.

6

Exhibit

000978

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Daniel D. Domenico**

Civil Action No. 1:23-cv-02989-DDD-MEH

JAMES HUNTER,

      Plaintiff,

v.

ALEXIS KING, District Attorney for the 1st Judicial District, in her official capacity;

CHRIS SCHAFFER, Director of the Colorado Bureau of Investigation, in his official capacity;

CHIEF SMITH, Chief of Police for the Lakewood Police Department, in his individual capacity;

YVONNE M. WOODS Officer, laboratory technician of the Colorado Bureau of Investigation, in her individual capacity;

      Defendants.

---

## ORDER

---

In this case, Plaintiff alleges that Defendants violated his due process rights by colluding to prevent him from conducting DNA testing on certain evidence that was used to convict him over twenty years ago. (Doc. No. 39.) Though Colorado state courts already denied his petitions under the state's postconviction DNA statute, he now seeks an order in federal court requiring Defendants to allow him to conduct the same DNA testing he already sought in state court and a declaration that the named Defendants violated his constitutional rights. (*Id.* at ¶ 64.) Because Plaintiff's suit essentially amounts to appeal of issues he already litigated in state court, however, it must be dismissed.

- 1 -

## BACKGROUND

Plaintiff filed his first complaint in this case on November 13, 2023. (Doc. No. 1.) In it, he brought a single cause of action under 42 U.S.C. § 1983, alleging that his due process rights under the 14th Amendment were violated when the Colorado Court of Appeals denied his postconviction petition seeking access to evidence for additional DNA testing. (*Id.* at ¶ 46.) Plaintiff sought both declaratory relief finding that the acts of Defendants violated his due process rights and injunctive relief requiring Defendants to provide him access to certain evidence for DNA testing. (*Id.* at ¶ 64.) On January 19, 2024, Defendants Alexis King and Reggie Marinelli filed a motion to dismiss Plaintiff's complaint. (Doc. No. 27.) On January 23, 2024, Defendants Alex Jameson and Richard Tewes also filed a motion to dismiss. (Doc. No. 28). Both of these motions were denied as moot in light of the amended complaint Plaintiff filed on February 9, 2024. (Doc. Nos. 39; 40.) In his amended complaint, Plaintiff did not change the cause of action or the relief he was seeking. (Doc. No. 39.) He did, however, drop a number of defendants from the suit and add allegations regarding the constitutionality of Colorado's postconviction DNA statute. (*Id.* at 32.) The remaining Defendants each subsequently moved to dismiss the amended complaint, and these motions are before me now. (Doc. Nos. 41; 43; 47; 72.)

## APPLICABLE LAW

Federal courts are courts of limited jurisdiction. Under Article III of the United States Constitution, federal courts only have jurisdiction to hear certain "cases" and "controversies," *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157 (2014), rendering them "duty bound to examine facts and law in every lawsuit before them to ensure that they possess subject matter jurisdiction." *The Wilderness Soc. v. Kane Cty.*,

632 F.3d 1162, 1179 n.3 (10th Cir. 2011) (Gorsuch, J., concurring). In-
deed, courts have an independent obligation to determine whether sub-
ject matter jurisdiction exists, even in the absence of a challenge from
any party. *1mage Software, Inc. v. Reynolds & Reynolds, Co.*, 459 F.3d
1044, 1048 (10th Cir. 2006) (citing *Arbaugh v. Y & H Corp.*, 546 U.S. 500
(2006)).

Pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure, a
party may bring either a facial or factual attack on subject matter juris-
diction, and a court must dismiss a complaint if it lacks subject matter
jurisdiction. *See Pueblo of Jemez v. United States*, 790 F.3d 1143, 1147
n.4 (10th Cir. 2015). For a facial attack, the court takes the allegations
in the Complaint as true; for a factual attack the court may not presume
the truthfulness of the Complaint's factual allegations and may consider
affidavits or other documents to resolve jurisdictional facts. *Rural Water
Dist. No. 2 v. City of Glenpool*, 698 F.3d 1270, 1272 n.1 (10th Cir. 2012)
(citing *Holt v. United States*, 46 F.3d 1000, 1002–03 (10th Cir. 1995)).
The burden of establishing jurisdiction always rests with the party as-
serting jurisdiction—here, Plaintiff. *See Kline v. Biles*, 861 F.3d 1177,
1180 (10th Cir. 2017).

## DISCUSSION

### I.   The *Rooker-Feldman* Doctrine

The court begins, as it must, by determining whether it has subject
matter jurisdiction. *See Colorado Outfitters Ass'n v. Hickenlooper*, 823
F.3d 537, 542, 544 n.5, 555 (10th Cir. 2016) (remanding case to district
court to dismiss for lack of jurisdiction where district court proceeded to
assess the merits of a case based on "some generous assumptions" about
jurisdiction, and emphasizing that a ruling based on incorrect assump-
tions about jurisdiction "is no ruling at all"). *See also Rivers v. Colorado*,

No. 22-cv-2922-WJM-STV, 2023 WL 5310145, at *4 (D. Colo. Aug. 17, 2023), *appeal pending* (overruling objection to magistrate judge's sua sponte recommending dismissal based on *Rooker-Feldman* doctrine). As follows, the court finds that it lacks subject matter jurisdiction over Plaintiff's claims under the *Rooker-Feldman* doctrine.

"The *Rooker-Feldman* doctrine is derived from 28 U.S.C. § 1257(a), [which] provides that only the Supreme Court has jurisdiction to hear appeals from final state-court judgments," *Suasnavas v. Stover*, 196 F. App'x 647, 652 n.3 (10th Cir. 2006) (internal quotation omitted), and gets its name from two Supreme Court decisions: *Rooker v. Fidelity Trust Co.*, 263 U.S. 413 (1923), and *District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462 (1983). "The *Rooker-Feldman* doctrine establishes, as a matter of subject-matter jurisdiction, that only the United States Supreme Court has appellate authority to review a state-court decision." *Merrill Lynch Bus. Fin. Servs., Inc. v. Nudell*, 363 F.3d 1072, 1074-75 (10th Cir. 2004) (footnote omitted).

The doctrine "precludes a losing party in state-court who complains of injury caused by the state-court judgment from bringing a case seeking review and rejection of that judgment in federal court." *Miller v. Deutsche Bank Nat'l Trust Co.*, 666 F.3d 1255, 1261 (10th Cir. 2012). The doctrine is "confined to cases of the kind from which the doctrine acquired its name: cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284 (2005).

"'The type of judicial action barred by *Rooker-Feldman* [] consists of a review of the proceedings already conducted by the 'lower' tribunal to

determine whether it reached its result in accordance with law.'" *PJ ex rel Jensen v. Wagner*, 603 F.3d 1182, 1193 (10th Cir. 2010) (quoting *Bolden v. City of Topeka*, 441 F.3d 1129, 1143 (10th Cir. 2006)). "*Rooker-Feldman* does not bar federal-court claims that would be identical even had there been no state-court judgment; that is, claims that do not rest on any allegation concerning the state-court proceedings or judgment." *Id.* (quoting *Bolden*, 441 F.3d at 1145). The doctrine applies where the relief sought requires the federal court to review and reject the state court judgment. *See id.* (citing *Mann v. Boatright*, 477 F.3d 1140, 1147 (10th Cir. 2007)); *cf. Mo's Express, LLC v. Sopkin*, 441 F.3d 1229, 1238 (10th Cir. 2006) (declining to apply *Rooker-Feldman* where the federal suit would not undo the state-court judgment).

The *Rooker-Feldman* doctrine bars not only claims seeking direct review of state court judgments, but also bars claims "inextricably intertwined with" an underlying state court judgment. *Feldman*, 460 U.S. at 482 n.16, 486; *Mothershed v. Okla. ex rel. Okla. Bar Ass'n*, 390 F. App'x 779, 780 (10th Cir. 2010). A federal claim is "inextricably intertwined" with a state court judgment when a plaintiff "can only succeed if [the federal court] conclude[s] the state got it wrong and effectively reverse[s] its decision or void[s] its ruling.*" Ziankovich v. Members of Colo. Supreme Court*, No. 20-1314, 2021 WL 4047000, at *4 (10th Cir. Aug. 10, 2021) (unpublished) (citing *Tal v. Hogan*, 453 F.3d 1244, 1256 (10th Cir. 2006), and *Campbell v. City of Spencer*, 682 F.3d 1278, 1283 (10th Cir. 2012) (explaining that "[t]he essential point [of the inextricably intertwined test is that] barred claims are those complaining of injuries caused by state-court judgments," meaning that "an element of the claim must be that the state-court wrongfully entered its judgment") (cleaned up). "A claim is inextricably intertwined if the state-court judgment caused, actually and proximately, the injury for which the federal-court

plaintiff seeks redress." *Tal*, 453 F.3d at 1256 (internal quotations omitted). The doctrine applies "after the state proceedings ended." *Exxon Mobil*, 544 U.S. at 291. "[I]f a lower state court issues a judgment and the losing party allows the time for appeal to expire, then the state proceedings have ended." *Bear v. Patton*, 451 F.3d 639, 642 (10th Cir. 2006) (internal quotation marks omitted). This is true whether or not other procedures remain pending in the case. *Id.* ("Although the state proceedings have not 'ended' in a general sense because the accounting and distribution of the proceeds of the sheriff's sale remain, a final judgment on Count II that was no longer appealable would have invoked *Rooker–Feldman's* jurisdictional bar"). *See also Wideman v. Colorado*, No. 06-cv-001423-WDM-CBS, 2007 WL 757639, at *2 (D. Colo. Mar. 8, 2007) (citing *Bear*, *Rooker-Feldman* doctrine applied despite state-court retaining jurisdiction over paternity and child custody cases until the child would become an adult). *See also Green v. Cnty. Ct. of City and Cnty. of Denver*, No. 10-cv-02876- BNB, 2011 WL 290645, at *2 (D. Colo. Jan. 26, 2011) (noting the plaintiff's appeal from state court judgment had been dismissed and holding that claims challenging plaintiff's treatment during proceedings in Denver County Court were barred by *Rooker-Feldman*: plaintiff's "claims for damages are inextricably intertwined with the state court judgment because in order for [plaintiff] to prevail in this action the Court would be required to review and reject the state-court judgment").

## II. Plaintiff's Claims are Jurisdictionally Barred

Evaluating Plaintiff's § 1983 claims pursuant to these standards, it is clear that Plaintiff's federal suit is fundamentally premised on the notion that his state court judgement under the Colorado post-conviction DNA statute was erroneous. This suit and Plaintiff's previous state court judgment are therefore inextricably intertwined.

In its opinion denying Plaintiff's petition under 18-1-411 to -417, C.R.S. 2021, the Colorado Court of Appeals emphasized that Plaintiff failed to adequately allege, as required by the statute, that favorable results of DNA testing would demonstrate his actual innocence. (Doc. No. 73 at 4.) In reaching this conclusion, the court emphasized that prosecutors had introduced evidence at trial indicating that two pubic hairs found at the crime scene were matches for his DNA profile. Even if Plaintiff could prove, as he now argues, that one of these samples resulted in a false positive due to contamination that occurred during a break in the chain of custody, "that still wouldn't negate the other sample from the scene that also matched his DNA profile." (*Id.* at 11.) Additionally, even if Plaintiff's petition for further DNA testing yielded favorable results, the Court of Appeals reasoned that this would not "negate the other evidence that supported the jury's verdict – including, in particular, evidence that he was in the vicinity of the crime scene at the time of the crimes, that his body size and features matched those of the perpetrator, that he was wearing clothes that fit the description of those worn by the perpetrator, and that the adult victim recognized his voice." (*Id.*)

Plaintiff's amended complaint reads primarily as a direct challenge to these findings made by the Colorado Court of Appeals. Indeed, it is replete with allegations that additional testing would be sufficient to prove his "actual and factual innocence." (Doc. No. 39 at ¶¶ 1, 2, 3, 5, 6, 7, 8, 9, 19, 36, 38, 42, 49, 52, 56.)  It is also replete with allegations regarding the sufficiency of the evidence that was used to convict him at trial. Plaintiff repeatedly alleges, for example, that he "was prosecuted and tried based on fabricated and false evidence." (Doc. No. 39 at ¶¶ 2, 18, 19, 34, 49, 63.) He also alleges that the evidence used to convict him is suspect because the Colorado Bureau of Investigation recently found

that one of the forensic scientists working on his case had manipulated data in the DNA testing process, calling into question the integrity of all of her work. (*Id.* at ¶¶ 20, 61.) Plaintiff also emphasizes that DNA testing has advanced significantly since the time of his conviction and that it is now far more reliable than it used to be, casting doubt on the DNA results that were used to convict him some twenty-plus years ago. (*Id.* at ¶¶ 25, 31.)

While I take no stance here on the merit of Plaintiff's claims about the reliability of the evidence that was used to support his underlying conviction, I do note that the entire gist of the complaint is to suggest that the Colorado Court of Appeals made an incorrect determination when it found that a favorable DNA test result would not have been enough to make a showing of actual innocence. By impugning the other evidence used against him at trial, Plaintiff clearly intends to establish the inference that a favorable DNA test result would show he is an innocent man. These facts, combined with Plaintiff's request for injunctive relief requiring the Defendants to conduct the same DNA testing he sought in his state court suit, suggest to me that Plaintiff essentially wants to relitigate an issue that was already decided in state court, and that I am therefore barred from assuming jurisdiction under the *Rooker-Feldman* doctrine.

Though Plaintiff summarily notes in a single paragraph of his 64-paragraph Complaint that "the Colorado post-conviction DNA statute is unconstitutional as construed by the Colorado courts", this threadbare assertion of a Constitutional cause of action is insufficient to overcome

a motion to dismiss.[1] (*Id.* at ¶ 32.) While it is true that a complaint need not be "a model of the careful drafter's art" or "pin plaintiff's claim for relief to a precise legal theory", it is also well-established that conclusory allegations are insufficient at this stage of litigation. *Skinner*, 562 U.S. at 530 (2011); *see generally Aschroft v. Iqbal*, 556 U.S. 662 (2009).

Plaintiff's recitation of this conclusory statement is not enough to overcome the obvious fact that the Plaintiff asks this court to revisit a state court judgment. Indeed, Plaintiff's elaboration on this statement belies the fact that he is actually challenging the *judicial application* of the DNA statute, not its facial constitutionality. Specifically, Plaintiff argues that "the current mechanism for DNA testing under C.R.S. 18-1-413 allows an innocent citizen to be denied access to DNA evidence when a judicial official uses a false narrative to substantiate a deficiency in the pleadings." (*Id.* at ¶ 54.) This is significant as it clearly indicates that Plaintiff's primary objection to the DNA statute has to do with the way state judicial officials chose to apply the law in his case, not with the constitutionality of the law itself. As Defendant Woods notes, "the basis of Plaintiff's First Amended Complaint is that Colorado state courts are denying him procedural due process in their <u>application</u> of the post-conviction DNA statute and that the statute, <u>as applied in this instance</u>, is unconstitutional." (Doc. No. 68 at 8.) Challenges of this sort, by contrast to facial constitutional challenges, amount to

---

[1] Notably, this is precisely the claim that was not barred by *Rooker-Feldman* in *Skinner v. Switzer*, 562 U.S. 521, 530 (2011). There, however, counsel for Skinner elaborated that the Texas postconviction DNA statute was unconstitutional because it was construed by the state courts to "completely foreclose any prisoner who could have sought DNA testing prior to trial, but did not, from seeking testing" postconviction. *Id.* Here, on the other hand, Plaintiff offers no substantive arguments supporting his assertion that the Colorado postconviction DNA statute is unconstitutional.

jurisdictionally-barred disputations of state court judicial determina-tions. *See Cooper v. Ramos*, 704 F.3d 772, 781 (9th Cir. 2012) ("Because Cooper in fact challenges the particular outcome in his state case, it is immaterial that Cooper frames his federal complaint as a constitutional challenge to the state court's decision, rather than as a direct appeal of that decision.") (cleaned up); *Wade v. Monroe Cnty. Dist. Attorney*, 800 Fed. App'x. 114, 119 (3d Cir. 2020) (holding that *Rooker-Feldman* barred claim where plaintiff was challenging the state court's "particular inter-pretation of the DNA statute and application of the statute to him"); *McKithen v. Brown*, 626 F.3d 143, 154-55 (2d Cir. 2010) (holding that *Rooker-Feldman* barred claim that "state court incorrectly and uncon-stitutionally interpreted the [New York DNA] statute by not assuming exculpatory results"). Plaintiff's suit is therefore the quintessential type which is encompassed by the *Rooker-Feldman* doctrine.

I am aware that the Supreme Court and the Tenth Circuit have re-cently reversed lower courts for employing the *Rooker-Feldman* doctrine too liberally. *See, e.g., Reed v. Goertz*, 598 U.S. 230, 237 (2023). The facts of those cases, however, are readily distinguishable from the facts of this one. In *McGowan v. Wal-Mart Stores*, the Tenth Circuit found that the District of Colorado improperly invoked the *Rooker-Feldman* doctrine because "the doctrine applies only to claims resting on allegations in-volving [] state-court proceedings" and the plaintiff's federal lawsuit did "not even mention the state-court lawsuit." 757 Fed. App'x. 786, 787 (10th Cir. 2019). Similarly, in *Huey v. Kunzweiler for Tulsa Cnty. State*, the Tenth Circuit found that the Northern District of Oklahoma was incorrect to construe the plaintiff's complaint as a challenge to a state court judgment, noting that "Mr. Huey's complaint does not even discuss his motion or the state-courts' disposition of the motion…[and] therefore cannot be fairly read as seeking review and reversal of state-court

decisions that he does not even discuss." 847 Fed. App'x. 530, 533 (10th Cir. 2021). Here, by contrast, the state court lawsuit is mentioned throughout the complaint and is a focal point of the Plaintiff's arguments.

In *Drexler v. Spahn*, the Tenth Circuit similarly found that this court had improperly invoked the *Rooker-Feldman* doctrine with respect to the plaintiff's claim that a state statute underlying a protection order was unconstitutional. No. 21-1368, 2022 WL 17333076, at *4 (10th Cir. Nov. 30, 2022). It noted that the plaintiff challenged the constitutionality of the state statutes and specifically alleged that the "Colorado protection order statutes are substantially overbroad and vague." *Id*. Plaintiff here, by contrast, does not offer any reason why the Colorado post-conviction statute is facially unconstitutional. Instead, he only challenges how state court judges chose to apply the statute to the facts of his case.

In *Graff v. Aberdeen Enterprizes, II, Inc.*, the Tenth Circuit again found that the Northern District of Oklahoma had erred in applying the *Rooker-Feldman* doctrine. 65 F.4th 500, 518 (10th Cir. 2023). Specifically, it found that the plaintiffs' claims were not properly barred by the district court because the plaintiffs were not challenging state court judgments themselves but were instead challenging the constitutionality of the debt-collection practices that were used to enforce them. *Id*. Here, on the other hand, Plaintiff specifically takes issue with the state court judgment itself.

Considering these facts and record as a whole, it is clear that Plaintiff satisfies all the requirements of the *Rooker-Feldman* doctrine: he is a state court loser, he complains of injuries caused by a state court judgment, this judgment was rendered before federal proceedings

commenced, and Plaintiff invites federal review of this judgment. Plaintiff's suit must therefore be dismissed for lack of subject-matter jurisdiction.

## CONCLUSION

It is ORDERED that:

Defendants' Motions to Dismiss (Doc. Nos. 41; 43; 47; 72) are GRANTED; and Plaintiff's Amended Complaint (Doc. No. 39) is DISMISSED WITHOUT PREJUDICE.

It is further ordered that Plaintiff's Motion for a Preliminary Injunction (Doc. No. 48) is DENIED as moot.

DATED: April 19, 2024          BY THE COURT:

                                           ~~Daniel~~ D. Domenico
                                           United States District Judge